**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANTS:

**AMY KAROZOS**
Greenwood, Indiana

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**ELLEN N. MARTIN**
DCS, Greene County Office
Bloomfield, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) |
| A.F-M. (Minor Child), | ) ) |
| AND | ) ) |
| A.M. (Mother), | ) ) |
| AND | ) ) |
| B.S.M. (Father) | ) ) |
| Appellants-Respondents, | ) ) |
| vs. | ) No. 28A05-1109-JT-497 ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES (DCS), | ) ) ) |
| Appellee-Petitioner. | ) |

**March 27, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellants-Respondents, A.M. (Mother) and B.S.M. (Father), appeal the trial court's termination of their parental rights to their minor child, A.F-M.

We affirm.

ISSUES

Mother and Father raise two issues on appeal, which we restate as:

(1) Whether the State presented sufficient evidence that there is a reasonable probability that the reasons for A.F-M's removal from the home would not be remedied; and

(2) Whether the State proved by clear and convincing evidence that there is a reasonable probability that continuation of the parents' relationship with A.F-M. poses a threat to his well-being.

Mother separately raises an additional issue, which we restate as: Whether the State violated Mother's due process rights.

## FACTS AND PROCEDURAL HISTORY

Mother and Father are the parents of A.F-M., born on July 15, 2010. On September 1, 2010, both parents were arrested and incarcerated for selling prescription medication. Marijuana was found in their residence and prescription pills and bottles were found scattered on the floor of their residence along with used syringes "which were in areas accessible to the child." (DCS Exh. 7, p. 1). A.F-M. and his older half-brother were subsequently removed by the Greene County Department of Children Services (DCS). On September 7, 2010, the trial court ordered A.F-M.'s continued removal and placement into foster care. A.F-M. was fifty-three days old at the time.

Prior to the removal of A.F-M. and his older half-brother, two of Mother's other children had been found to be children in need of services (CHINS). In May 2005, Mother threatened suicide and police located paraphernalia and marijuana in her residence. Mother was arrested and tested positive for methamphetamines, cocaine, and opiates. She admitted both children were CHINS and the children were placed in foster care. Mother was ordered to participate in drug treatment, visitations, and other services. Mother reunited with the children in 2006, but the children were removed again two months later in connection with Mother's driving while intoxicated with children in the car. Mother was also found to have violated probation and entered in-patient treatment for drug abuse. She did not complete the program and eventually one child was placed with his maternal grandparents and one child was placed with his biological father.

3

On October 12, 2010, DCS filed a petition alleging that both A.F-M. and his older half-brother were CHINS, and the trial court conducted a fact-finding hearing on the petition the same day. On October 13, 2010, the trial court found both children to be CHINS. On November 15, 2010, the trial court held a dispositional hearing and entered a Parental Participation Order. Mother and Father were ordered to undertake a variety of obligations to address their substance abuse issues including attending self-help groups; participating and completing substance abuse programs; participating in individual counseling sessions regarding substance abuse and other issues; refraining from all illegal drug use and taking all prescribed drugs in accordance with the prescriptions; and undergoing random drug screens. The parents were also ordered to attend supervised visits with A.F-M., receive parenting education, and obtain legal and stable income. Mother was further ordered to obtain a G.E.D.

Following CHINS adjudication, Father and Mother received substance abuse counseling and treatment at Hamilton Center, which involved working with counselors there in both group and individual settings. Father and Mother were each diagnosed as dependent on multiple substances. Although they attended several group and individual sessions, they did not complete the entire program prior to their incarceration. Father was also accused of dealing drugs while in counseling. Father and Mother were subject to a number of drug screens and until December 2010 Mother continued to test positive for drugs other than those prescribed. Father's tests were negative for drugs other than those

he was prescribed, but his levels for such medications were in excess of the amounts prescribed.

Beginning in October 2010, Carol Lasiter (Lasiter) of Ireland Home-Based Services provided parent education and assistance as well as supervision of Mother and Father's visits with A.F-M. Eighty supervised visits with A.F-M. were scheduled from October 2010 to January 2011. Mother and Father attended sixty-six sessions, cancelled eight visits, and failed to show for six visits. They attributed their cancellations and no shows to weather conditions, lack of reliable transportation, and the remote location of their residence. Visitations were later moved to the family's residence, which alleviated the no shows. Lasiter also attempted to assist Father with obtaining public housing and employment. Father's attempts at both were unsuccessful, with the employment attempts hampered to some degree by his lack of follow up.

On January 12, 2011, Mother was convicted of a Class C felony for dealing in a controlled substance in connection with her September 1, 2010 arrest. Mother received a sentence of seven years executed at the Department of Correction (DOC), with two years suspended. At sentencing, the trial court found Mother's prior convictions, her continued drug use following arrest, and that a baby and a child were present at the time of the offense to be aggravating factors. Mother's prior convictions included a probation violation, disorderly conduct, possession of cocaine, operating a motor vehicle while under the influence in a manner that endangered a person, and driving while suspended. In noting the likelihood that Mother would commit additional crimes, the trial court

mentioned Mother's numerous prior arrests, which included a number of drug-related offenses as well as domestic battery, disorderly conduct, and maintaining a common nuisance. Mother's earliest possible release date from the DOC was January 8, 2013.

On February 23, 2011, Father was convicted of a Class C felony in connection with his September 1, 2010 arrest for dealing in a controlled substance. Father received an executed sentence of six years at the DOC, with two years suspended. The trial court found Father's prior criminal history, history of probation violations, and that a child was present during the offense to be aggravating factors. Father's criminal history consisted of several out of state convictions, including a conviction in Kansas for felony possession of methamphetamine with intent to distribute, a conviction in Illinois for unlawful delivery of alcohol to a minor, a conviction in Illinois for unlawful use of weapons, and a conviction in Florida for possession of cocaine and paraphernalia. The trial court noted that two warrants were currently outstanding for Father's arrest, one from Illinois for failure to appear and one from Florida for a probation violation.

While incarcerated, Mother earned her G.E.D. and received a sentence reduction of 183 days. Mother participated in work crews and learned to operate machinery as well. Mother joined substance abuse programs and sought to join an intensive counseling program, which upon completion would have resulted in a further six month reduction from her sentence. During his incarceration, Father "tested out" of an intensive counseling program and was wait-listed for participation in a re-entry initiative. (Transcript p. 220).

6

On March 14, 2011, the trial court held a review hearing. The trial court found that both Father and Mother had not complied with A.F-M.'s case plan and had not cooperated with DCS. The trial court also found that the reasons for A.F-M.'s removal had not yet been alleviated and that DCS had made reasonable efforts to reunite the family. In continuing obligations imposed upon Father and Mother, the trial court accounted for their incarceration by ordering them to continue participation with the services while incarcerated as well as to address "the underlying needs that lead to [their] long history of substance abuse." (DCS Exhibit 7).

On May 16, 2011, the trial court held both a second review hearing and a permanency hearing. On May 25, 2011, the trial court issued its order approving the permanency plan. The trial court found both parents not in compliance with the case plan because both were incarcerated and were "unable to participate in DCS services." (DCS Exhibit 7). The trial court reviewed permanency planning options and found that proceedings to terminate parental rights to be in A.F-M.'s best interest.

On June 8, 2011, DCS filed its petition to terminate Mother and Father's parental rights to A.F-M. On June 15, 2011, the trial court issued its order on periodic review, finding both parents in non-compliance with A.F-M.'s case plan, yet finding that both parents had cooperated with DCS. They were ordered to continue participation with services during incarceration. An amended order approving the permanency plan and an order for DCS to discontinue services to Mother and Father were issued the same day. On August 23, 2011, the trial court held a hearing on the petition. On September 8, 2011,

7

the trial court issued separate orders terminating each parent's parental rights, containing separate findings of fact and conclusions of law as to each parent. In each order, the court found that DCS had proven by clear and convincing evidence that A.F-M. had been removed for a period of more than six months pursuant to a dispositional decree, that there is a reasonable probability that the conditions that resulted in A.F-M.'s removal would not be remedied, that continuation of the parent-child relationship of either parent poses a threat to A.F-M.'s well-being, that termination of the parent-child relationship is in A.F-M.'s best interests, and that DCS had a satisfactory plan for A.F-M.'s care, that of adoption. Findings of fact in support consisted of the parents' criminal records, including the maximum, minimum, and probable duration of incarceration for each parent. Although noting the extent of each parent's participation in services provided by DCS, the trial court found that each parent would likely adhere to past behaviors and that waiting an indefinite period of time to determine if either parent's behavior would change would not be in A.F-M.'s best interests.

Mother and Father filed separate appeals of the trial court's termination orders. On January 19, 2012, pursuant to Ind. Appellate Rule 38, we ordered each appeal consolidated under a single cause number.

Mother and Father now appeal. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

We do not reweigh the evidence nor assess the credibility of the witnesses when reviewing termination proceedings on appeal. *In re J.H.*, 911 N.E.2d 69, 73 (Ind. Ct.

App. 2009), *trans. denied*. Instead, we consider only the evidence supporting the trial court's decision and reasonable inferences drawn therefrom. *Id*.

The trial court here entered separate findings of fact and conclusions of law in terminating both Father and Mother's parental rights to A.F-M. Our standard of review is therefore two-tiered. *Id*. We first determine whether the evidence supports the findings, and second, whether the findings support the trial court's legal conclusions. *Id*. In deference to the trial court's unique position to assess the evidence, we set aside the trial court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the trial court's legal conclusions are not supported by its findings of fact or do not support the judgment. *Id*.

On appeal, Mother and Father contest the trial court's findings that clear and convincing evidence established a reasonable probability that (1) the reasons for A.F-M.'s removal will not be remedied, and (2) continuation of Father and Mother's relationship with A.F-M. poses a threat to his well-being. Mother further alleges that DCS violated her procedural due process rights by failing to fulfill its statutory mandate to provide reasonable efforts at reunification as well as to provide her notice of what she needed to do to avoid termination of her parental rights.

I. *Termination of Parental Rights*

In order to terminate parental rights, DCS must file a petition alleging each of the four elements specified in Ind. Code § 31–35–2–4(b)(2)(A)-(D) and must prove each by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1262 (Ind. 2009). Clear and convincing requires that a fact's existence be "highly probable." *Hardy v. Hardy*, 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). If the trial court finds that the allegations contained in the petition are true, it "shall terminate the parent-child relationship." I.C. § 31-35-2-8(a); *In re C.M.*, 960 N.E.2d 169, 1975 (Ind. Ct. App. 2011), *aff'd on reh'g*, No. 15A01-1104-JT-204, 2012 WL 453958 *1 (Ind. Ct. App. Feb. 14, 2012).

Mother and Father do not challenge the trial court's determinations under I.C. § 31-35-2-4(2)(A) (removal of the child), (C) (best interests of the child), or (D) (satisfactory plan). Instead, Mother and Father dispute the trial court's determinations under I.C. § 31–35–2–4(b)(2)(B), which requires proof by clear and convincing evidence that one of the following be true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS].

As I.C. § 31–35–2–4(b)(2)(B) is written in the disjunctive, proof of any one sub-element is sufficient. *In re J.T.*, 742 N.E.2d at 512.

A. *Remedy of Conditions*

In determining whether a reasonable probability exists that the conditions resulting in the child's removal will not be remedied, the "trial court must judge [the parents'] fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions." *Id.* "There may well be no evidence of 'changed conditions,' but there must be evidence of 'current' conditions." *In re C.M.*, 2012 WL 453958 *1. The trial court must also consider the parents' "habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* "A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe County Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court can consider the services offered and the parents' response as well. *In re C.M.*, 2012 WL 453958 *1. The trial court's findings cannot solely focus on "historical conduct, absent findings of fact as to [the parents'] current circumstances or evidence of changed conditions." *In re C.M.*, 960 N.E.2d at 175. DCS "is not required to rule out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *C.T. v. Marion Cnty. Dept. of Child Services*, 896 N.E.2d 571, 578 (Ind. Ct. App. 2008), *trans. denied* (quotation omitted).

In maintaining that DCS did not meet its burden, Mother argues that the trial court failed to take into account "her progress in meeting the reunification goals" following

incarceration. (Mother's Br. p. 14).[1]  Mother points to evidence that at the time of the termination hearing she was drug-free, had participated in drug treatment and other programs, and had received her G.E.D.  Mother also indicated her willingness to continue drug and other rehabilitation programs following her release from the DOC, which with possible time reductions, would be January 8, 2013, or possibly earlier.  Finally, Mother argues that the trial court improperly focused on Mother's prior CHINS proceedings, criminal convictions, and arrests, and improperly concluded that her lack of prior participation is indicative of her future participation.

Based on our review of the record, we cannot agree with Mother that there was insufficient evidence of a reasonable probability that the conditions leading to A.F-M.'s removal would not be remedied.  Although the trial court's findings must contain evidence of Mother's current circumstances and changed conditions, the trial court has discretion to weigh such evidence against "evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment."  *McBride*, 798 N.E.2d at 199.  Here, the trial court weighed Mother's accomplishments while incarcerated against her substantial prior criminal history, substance abuse history, prior CHINS proceedings, her current executed sentence, as well as the degree of her participation in the services offered by the DCS prior to incarceration.  "[N]either trial courts nor we are required to ignore 'the parent's

---

[1] Father and Mother separately appealed the trial court's decision.  We designate Father and Mother's appellant brief herein by name.

habitual patterns of conduct [when determining] the probability of further neglect or deprivation of the child.'" *Prince v. Dept. of Child Services*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007) (quotation omitted). In essence, Mother's argument is simply an invitation to reweigh the evidence, which we may not do. *C.T.*, 896 N.E.2d at 583.

To the extent that Mother argues that she did not have ample time to demonstrate her fitness as a parent, we note that the trial court in a termination hearing may properly consider the services provided to the parent as well as the parent's response. *In re C.M.*, 2012 WL 453958 *1. Here, it is clear that Mother received substance abuse, grief, and parenting skills counseling well before the filing of the termination petition and the trial court considered her historical responses to such services. Prior to and following the CHINS proceeding, Mother again received substance abuse counseling, yet admittedly did not abstain from drugs until her incarceration beginning in January 2011. Although the outcome of Mother's progress with services undertaken while incarcerated is unknown, we note that the responsibility for a parent "to rehabilitate themselves is during the CHINS process, prior to the filing of the petition for termination." *Prince*, 861 N.E.2d at 1230. Here, Mother had ample opportunities to do so prior to incarceration, and we cannot say that Mother's current sobriety would be otherwise without incarceration. *See id.* Based on this evidence, we find that the trial court properly determined that DCS had shown by clear and convincing evidence that there is a reasonable probability that the reasons for A.F-M.'s removal would not be remedied.

Father also maintains that DCS did not meet its burden to establish that there is a reasonable probability that the reasons for removal will not be remedied and in support cites to *In re M.W.*, 943 N.E.2d 848 (Ind. Ct. App. 2011), *trans. denied*. The father in M.W. was incarcerated three times during CHINS and termination proceedings, with the final period of incarceration ending shortly after the trial court's termination order. *Id*. at 855. The *M.W.* court pointed out that the trial court focused on the father's incarceration, visitation compliance, and lack of employment and residence. *Id*. However, noting the father's "many strides" in completing the reunification plan and his impending release following the termination hearing, the court found that the father's "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time." *Id*. (quoting *In re J.M.*, 908 N.E.2d 191, 196 (Ind. 2009)).

Relying on the *M.W.* court's observation on what factors the trial court in that case focused upon, Father argues that evidence of his drug use, lack of employment and residence were insufficient to establish by clear and convincing evidence that there is a reasonable probability that the conditions for A.F-M.'s removal would not be remedied. Father takes issue with the trial court's finding that his drug screens were positive and that he was never sober during periods of substance abuse treatment. Father points to his clean drug test results following A.F-M.'s removal, and although these drug screens showed an excessive use of prescribed medicine, Father explains that this was an "anomaly" resulting from his contraction of hepatitis. Father also points to undisputed

14

testimony that "he does not have a drug problem because the [DOC] had made that determination and he had been through so many drug programs previously." (Father's Br. p. 12). Thus, Father argues the reason for A.F-M.'s removal, Father's drug use, is no longer a factor. Father also contends that the evidence shows his progress in certain substance abuse programs prior to and during incarceration.

Father's argument fails because this is a request for us to reweigh such evidence against other evidence establishing Father's drug abuse, which we may not do. The trial court received contradictory evidence of Father's sobriety, including testimony from Mother that Father still had a drug problem, the opinion of one of his counselor's that Father was still abusing drugs, and Father's prior drug offense convictions. We also note that the trial court considered Father's earliest release date from incarceration, yet also found that Father "at the time of [A.F-M.'s] removal was wanted on warrant and is still wanted on warrant in the States of Florida and Illinois." (Father's App. p. 38). Based on this evidence, we cannot say that the trial court committed clear error by determining that DCS had shown by clear and convincing evidence that there was a reasonable probability that the reasons for A.F-M.'s removal would not be remedied.

B. *Threat to Well-Being*

Next, Mother and Father each argue that DCS did not establish that continuation of their relationship with A.F-M. poses a threat to his well-being. Since I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court need only find that one of three sub-elements are met. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806

N.E.2d 874, 882 (Ind. Ct. App. 2004), *trans. denied*. Here, the trial court concluded that that there is a reasonable probability that the reasons for removal would not be remedied. It is therefore not necessary for us to address Mother and Father's arguments on whether continuation of their relationship would harm A.F-M.'s well-being. *Id*. However, since the trial court entered findings of fact and addressing this sub-element for each parent, we will examine Mother and Father's arguments.

Mother characterizes the trial court's conclusion that continuation of Mother and A.F-M.'s relationship poses a threat to A.F-M. as a conclusion premised upon A.F-M.'s need for permanency. Mother argues that permanency was insufficient "to prove that [A.F-M.] would be harmed by remaining with his foster parent without termination and adoption while [Mother] completed her sentence and services." (Mother's Br. p. 17). Mother also points to her voluntary participation in substance abuse treatment prior to the CHINS adjudication and that each visitation with the child went fine, with both parents interacting well with the child. Although Mother missed several visitations, her absences can be ascribed to the remote location of her residence, her lack of transportation, and weather conditions. In sum, Mother argues that evidence of her positive efforts along with an insufficient showing of how allowing Mother additional time to complete the services would be a threat to A.F-M., given his age, does not support the trial court's determination that continuation of the parent-child relationship poses a threat to A.F-M.'s well-being.

16

Father argues that since his drug use was the primary reason for A.F-M.'s removal and since the evidence established that he was no longer a drug addict, the threat to A.F-M.'s well-being no longer exists. Further, Father's visitations with the child went well and any missed visitations resulted from the same reasons cited by Mother: location of their residence, lack of reliable transportation, and weather conditions. Finally, despite Lasiter's concerns over Father's ability to secure stable income and provide housing for A.F-M., Father asserts that there was evidence that he sought employment and that he is appealing a denial of public housing benefits.

Both Father and Mother cite to *H.G. v. Indiana Department of Child Services*, 959 N.E.2d 272 (Ind. Ct. App. 2011), *reh'g denied*, to support their arguments. *H.G.* concerned parent-child termination proceedings involving three children from two separate fathers and a common mother. *Id.* at 272. At the time of termination proceedings, one father was incarcerated while the other father, the mother's current husband, had recurring substance abuse episodes and difficulties procuring suitable employment and housing. *Id.* at 282-84. Taking into account several factors including one child's reluctance to be adopted, each parent's significant participation with services provided by DCS, as well as DCS's failure to identify an adoptive family, the court found that DCS had not presented clear and convincing evidence that termination was in the children's best interests despite the mother and one father's incarceration, the other father's drug use, and DCS's proffered justification of the children's need for stability

17

and permanency. *Id*. at 291-94. Accordingly, the court found "there appears to be little harm in allowing the parents to continue working toward reunification." *Id*. at 293.

*H.G.* involved the court's review of the sufficiency of evidence regarding I.C. § 31-35-2-4(b)(2)(C), whether termination is in the child's best interest, rather than the reasonable probability that continuation of the parent-child relationship poses a threat to the child's well-being. *Id*. at 289. Also, the *H.G.* court's reasoning for reversing the trial court's termination of parental rights rested in no small part upon each parent's "significant efforts at self-improvement," specific examples of the strong bond the children had with their fathers and the mother, and the inability of DCS to identify an adoptive home for the children. *Id*. at 293.

Here, while there is evidence of the parents' positive interactions with A.F-M. during visitations, the child was removed when he was approximately six weeks old and has not returned to his parents' care since then. Although the parents point to their efforts to address their substance abuse and parenting issues, their substance abuse counselors, Lasiter, as well as their family case manager all testified to the inability of the parents to complete their counseling programs and failure to make overall progress, as well as their concerns over the abilities of Father and Mother to take care of A.F-M. Finally, the lack of an adoptive home for A.F-M. was not raised by the parties here as an issue. Accordingly, we do not find Mother and Father's citation to *H.G.* persuasive to support their contentions.

18

"[A] trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that [the child's] physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002), *trans. denied.* Here, despite its acknowledgement of the parents' bond with A.F-M. and their albeit minimal efforts at self improvement, the trial court weighed the evidence and found that the parents' prior conduct constituted clear and convincing evidence of a reasonable possibility that continuation of their relationship with A.F-M. poses a threat to his well being. The evidence in the record supports the trial court's findings cited above and the findings support the trial court's conclusion. *See In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d at 882-83. Accordingly, the parents have not made a showing of clear error entitling them to a reversal of the trial court's termination of their parental rights.

## II. *Procedural Due Process*

Mother asserts that she was denied due process of law by DCS. Specifically, Mother contends that DCS did not follow "its statutory mandate to make reasonable efforts to reunify the family" or provide "[Mother] with notice of what conduct could lead to termination of parental rights." (Mother's Reply Br. p. 4).

We note that a party may not raise a constitutional claim for the first time on appeal. *See In re S.P.H.*, 806 N.E.2d at 877. The record reveals no instance where Mother raised her due process argument during the termination proceeding. Mother's

19

alleged due process violation argument is therefore waived on appeal. *Id.* at 877–78. Waiver notwithstanding, we address Mother's contentions on their merits.

We have described the impact of due process in light of a failure to comply with statutory provisions as follows:

> When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of the due process clause. Our legislature has enacted an interlocking statutory scheme governing CHINS proceedings and the involuntary termination of parental rights proceedings. This statutory scheme is designed to protect the rights of parents in raising their children while allowing the State to effect its legitimate interest in protecting children from harm. The CHINS and involuntary termination statutes are not independent of each other. [I.C. §] 31-35-2-2 clearly states that although termination proceedings are different from CHINS proceedings, an involuntary proceeding is "governed by the procedures prescribed by" the CHINS statutes contained in [I.C.] Article 31-34.

*In re S.P.H.*, 806 N.E.2d at 878 (citations omitted).

Mother alleges that the DCS did not make reasonable efforts to reunify the family by not allowing her additional time to complete the case plan during her incarceration. Further, Mother alleges she "did what she believed was expected of her once she was incarcerated" and "was not given notice that she was required to do more […] or to do anything differently in order to avoid the termination of her rights to her son." (Mother's Br. p. 21). Mother points to her progress towards sobriety and efforts to better herself while incarcerated along with her requests for visitation with A.F-M., despite DCS's inability in allowing visitations occur during her incarceration. In sum, Mother argues that

> DCS continued to allow [Mother] to believe if she participated in services specified in the [Parental Participation Order] while she was incarcerated, that she could be reunited with her child, and then though nothing had changed, once the six month minimum period had passed, requested to change the permanency plan to termination of parental rights and adoption, and then filed to involuntarily terminate [Mother's] parental rights to her son.

(Mother's Reply Br. p. 6).

Mother's assertion is not persuasive. As has been stated many times, "the provision of family services is not a requisite element of our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal." *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000). The Parental Participation Order informed Mother that failure to comply with its terms could result in termination of her parental rights. Here, Mother had been provided with services since October 2010 and had ample opportunity to take full advantage of such services and to fully comply with her obligations under the Parental Participation Order prior to her incarceration in January 2011. Mother failed to do so by failing drug screens, missing visitations, and parenting classes. Further, Mother has not pointed to any evidence suggesting that DCS led her on or made any agreement with Mother such that it would wait to file a termination petition. *See In re E.E.S.*, 874 N.E.2d 376, 381 (Ind. Ct. App. 2007), *trans. denied* (reversing a termination case that would have been ordinarily affirmed but for DCS's breach of an agreement to allow parent time to complete services following release from incarceration). Accordingly, we find no due process violation here.

CONCLUSION

Based on the foregoing, we conclude that (1) the DCS provided sufficient evidence that the conditions that led to A.F-M's removal from the home would not be remedied and that the continued relationship with Father and Mother poses a threat to the child's well-being, and (2) that Mother was not denied procedural due process.

Affirmed.

FRIEDLANDER, J. and MATHIAS, J. concur