# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**ATTORNEY FOR APPELLANT**

Cory A. Spreen
Fort Wayne, Indiana


Colin Z. Andrews
Bluffton, Indiana

**ATTORNEYS FOR APPELLEE**

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorney Generals
Indianapolis, Indiana



## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: the Termination of the Parent-Child Relationships of L.B., S.F., and E.F.; | November 13, 2015 |
| R.F. and A.H., | Court of Appeals Case No. 02A04-1502-JT-76 |
| *Appellants-Respondents,* | Appeal from the Allen Superior Court |
| v. | The Honorable Charles F. Pratt, Judge |
| The Indiana Department of Child Services, | Trial Court Cause Nos. 02D08-1405-JT-52 02D08-1405-JT-54 |
| *Appellee-Petitioner.* | |

**Pyle, Judge.**

# Statement of the Case

Appellants/Respondents, R.F. ("Father") and A.H. ("Mother") (collectively, "the parents"), appeal the trial court's order terminating their parental rights to their minor children L.B., S.F., and E.F. The children were determined to be children in need of services ("CHINS") because, among other reasons, the parents were unable to maintain safe and stable housing. They were also determined to be CHINS when the Indiana Department of Child Services ("DCS") substantiated allegations that Father had sexually abused L.B. After the children had been adjudicated CHINS for over a year, DCS filed a petition to terminate the parents' parental rights, and the trial court held a hearing on the petition. It terminated the parents' parental rights, concluding that the conditions that had led to the children's removal or continued placement outside of their home would not be remedied and that termination was in the children's best interests.

On appeal, the parents argue that the trial court erred in terminating their parental rights because the evidence did not support its conclusion that the conditions that had led to the children's removal or continued placement outside of the home would not be remedied. Mother also asks us to reconsider the trial court's determination that termination was in the children's best interests. Because we conclude that the evidence supported the trial court's conclusion regarding the conditions that led to the children's removal and that Mother has not raised a cogent argument regarding the best interests of the children, we affirm the trial court's judgment.

We affirm.

## Issue

Whether the trial court erred in terminating the parents' parental rights.

## Facts

Mother and Father are the parents of L.B., S.F., and E.F. (collectively, "the children"), who were born in July 2008, March 2012, and May 2013, respectively. In September 2012, before E.F. was born, Mother and Father became involved with DCS in Kosciusko County when DCS substantiated allegations that the parents had neglected L.B. and S.F. by failing to provide them with safe or sanitary housing conditions. At the end of October 2012, the Kosciusko County DCS began to provide services for the parents through an informal adjustment. Michelle Starnes ("Starnes"), a rehabilitative service provider at the Bowen Center, started to work with the parents in December 2012 on cooking and cleaning skills, social skills, and parenting, and DCS also referred the parents to psychologist Clinton Krouse ("Dr. Krouse") with the Bowen Center, for parenting and psychological evaluations.

On December 13, 2012, Dr. Krouse interviewed Father and administered several psychological tests, including: (1) the Minnesota Multiphasic Personality Inventory, Second Edition ("MMPI-2"), which "has multiple index scales for validity and personality issues along with traits such as schizophrenia, depression, anxiety, [and] propensity to harm others," (Tr. 37); (2) the Child Abuse Potential Index ("CAPI"), which measures "multiple characteristics of

known physical abusers of children"; (3) the Parenting Stress Index; and (4) the Adult-Adolescent Parenting Inventory. (Tr. 58). The next day, Dr. Krouse met with Mother. He interviewed her and administered the same psychological tests to her that he had administered to Father, except that Mother took the Personality Assessment Inventory instead of the MMPI-2.

[6] Father's MMPI-2 results were considered invalid due to his inconsistent responses and exaggeration. His results for the CAPI indicated that he had the characteristics of known physical abusers of children, and his results for the Parenting Stress Index indicated that he might have several issues in need of immediate attention, such as "being overwhelmed" and "managing" parenting. (Tr. 39). Dr. Krouse was not able to render a diagnosis for Father, due to the invalid test results, but he recommended that Father: (1) receive assistance in finding housing, clothing, and food; (2) receive assistance learning to maintain a clean residence; and (3) undergo therapy for anger management as Father had admitted that he had anger management problems.

[7] Mother's Personality Assessment Inventory results were invalid because they indicated that she had an "overly negative self-presentation" and "an elevated malingering index." (Tr. 41). Malingering is "when people exaggerate their symptoms to get a secondary gain of some sort so as to get out of trouble, to get money[,] or any sort of secondary gain that you can gain from over-exaggerating." (Tr. 42). Mother's CAPI results also were invalid because two scales were elevated—the lie scale and the "faking good" scale, which is caused when the test-taker "[p]resent[s] [herself] in an overly favorable light that

everything is perfectly fine despite the fact that other things are [not]." (Tr. 51). Nevertheless, the CAPI indicated that Mother also had characteristics consistent with known abusers of children. Because Mother's results were too inconsistent, Dr. Krouse did not diagnose her. However, he recommended, among other things, that Mother: (1) fulfill her basic needs, such as obtaining housing; (2) learn to maintain a home; and (3) receive occupational therapy.

[8] In November 2012, DCS removed L.B. and S.F. from the parents' care. Subsequently, on January 31, 2013, DCS filed a petition alleging that they were CHINS. The parents had been living in motels, but in January 2013, they began renting a room in a boarding house. They moved from Kosciusko County to Allen County, so the Kosciusko County Court transferred the CHINS matter to the Allen County Superior Court. The trial court conducted an initial hearing on the petition on February 5, 2013, entered denials of the allegations on behalf of the parents, and authorized DCS to file an amended petition.

[9] On February 25, 2013, DCS filed an amended petition, again alleging that L.B. and S.F. were CHINS. In its amended petition, DCS alleged that the parents had been unable to provide L.B. and S.F. with stable and sanitary housing for several months and had continued to have unstable and unsanitary housing after L.B. and S.F. had been removed from the parents' care. The petition also alleged that: (1) on one day, S.F. had fallen off the bed approximately four times due to lack of supervision by Mother; (2) L.B. had been observed with a quarter-sized bruise on his left shoulder and a red mark across his breastbone;

(3) L.B. had not been provided with his prescription medication for three weeks; (4) Mother had reported that she had needed to intervene once when Father had thrown L.B. on the bed for talking back and then picked him up by his neck, leaving his handprints on L.B.'s skin; (5) Father had placed L.B. in a restraint twice by wrapping his arms and legs around L.B.'s body while putting his hand over L.B.'s mouth to keep him from screaming; (6) Father had anger issues and had once "blacked out" from rage while using physical discipline on L.B.; (7) Father's behavior was abusive; and (8) Mother was unable to protect L.B. and S.F. from Father. (State's Ex. E at 5).

[10]     In an initial hearing on the amended petition, Mother denied that Father's behavior was abusive and that she was unable to protect the two children but admitted to the remainder of DCS's allegations against her.[1] Father denied that he had placed L.B. in a restraint; that S.F. had fallen off the bed; that he had blacked out from rage; and that he was abusive, but he admitted the remainder of the allegations against him. Based on the admitted allegations, the trial court found that L.B. and S.F. were CHINS. As a result, it ordered the parents to, among other requirements: (1) maintain clean, safe, and appropriate sustainable housing at all times; (2) ensure the two children attended all medical appointments and followed the recommendations of their doctor; (3) enroll in

---

[1] Although Mother admitted that she had needed to intervene when Father threw L.B. on the bed and then picked him up by his neck, she later denied that allegation at the termination hearing.

SCAN's[2] home-based services program, participate in all sessions, and successfully complete the program; (4) enroll in individual counseling, attend all sessions, and successfully complete the program; (5) enroll in parenting classes, attend all classes, and complete the program; (6) obtain psychiatric evaluations and follow the recommendations; and (7) participate in visits with the children. In addition, the trial court ordered Father to obtain and maintain suitable employment.

[11] DCS Family Case Manager, Molly Hall ("FCM Hall"), began to work with the parents in January 2013. The parents told FCM Hall at that time that L.B. and S.F. had various medical conditions. Specifically, they reported that S.F. had been diagnosed with a seizure disorder and had a respiratory condition that required her to use a nebulizer machine for breathing treatments on a regular basis. FCM Hall reviewed S.F.'s medical records and talked to her previous medical providers but could not confirm those diagnoses.

[12] Additionally, the parents told FCM Hall that L.B. had autism, was frequently violent and aggressive, and had "meltdowns." (Tr. 539). Father said that the parents had been evicted from their home because he had been required to stay home from work to care for L.B. due to L.B.'s "meltdowns" and, as a result, had lost his job. (Tr. 539). Mother said that L.B.'s meltdowns were so bad that they were banned from using the Medicaid cab service to get to doctor

---

[2] SCAN stands for "Stop Child Abuse & Neglect" and is an organization that helps with home-based case management and other initiatives.

appointments.  Father said that he spanked L.B. to discipline him and that, at one point, he was spanking L.B. every ten to fifteen minutes.  He said that "sometimes he would get so angry he would blackout."  (Tr. 539).  FCM Hall obtained L.B.'s medical records, contacted First Steps where L.B. had previously been enrolled, spoke to L.B.'s preschool teacher from Kosciusko County, talked to L.B.'s Allen County foster parent, contacted L.B.'s pediatrician, and had L.B. evaluated for autism during play therapy, but she did not find any evidence that L.B. had autism.

[13]  Thereafter, in March 2013, the parents began to engage in psychiatric services as ordered by the trial court.  Hani Ahmad ("Dr. Ahmad"), a psychiatrist with the Bowen Center, conducted the parents' psychiatric review and saw them six times between March 2013 and July 2014.  He diagnosed Mother with panic disorder and generalized anxiety disorder.  Although Mother told him that she had been diagnosed with bipolar disorder and attention deficit/hyperactivity disorder ("ADHD") in the past, he did not see evidence of either of those disorders and so did not treat them.  He diagnosed Father with generalized anxiety disorder and determined that Father had anger issues.

[14]  Also in March 2013, the parents started to have supervised visitation with L.B. and S.F.  Vickie Heath ("Heath"), a program director and therapist with Whitington Homes and Services for Children and Family ("Whitington Homes"), supervised visitation for the parents from March of 2013 through July of 2013.  At first, she supervised the visits by herself, but then FCM Hall started stopping in.  Stacey Dickerson ("Dickerson") at Whitington Homes also

supervised visitation during part of the same time period as Heath—from May 2013 until the end of July 2013.

[15] Initially, the parents met with L.B. and S.F. once per week for an hour. The first visit the parents had with the two children was at the Interfaith Hospitality homeless shelter ("Interfaith"), where the parents lived at the time. Then the parents were later accepted into the Vincent Village homeless shelter ("Vincent House") and transferred visits there. During the visits, L.B., who was four years old at the time, spent a lot of time hiding under the table. The parents had L.B. wear earmuffs and sunglasses due to his purported autism and also due to the fact that he was, according to them, light and sound sensitive. When Heath performed an assessment of L.B., she found that he was a "typical" four year old and did not have any developmental issues. (Tr. 291).

[16] While the parents were living at the Vincent House, they began to rent a house on Webster Street in Fort Wayne through a rent-to-own arrangement, even though they still lived at the Vincent House. The house had been vacant for several years and needed a lot of repair work. FCM Hall expressed concern that the home was beyond the parents' financial means and advised that they consider a more cost-effective option, but they chose to disregard her suggestion.

[17] In May 2013, E.F. was born. The day after his birth, DCS took him from the parents and placed him in foster care. DCS filed a petition alleging that he was a CHINS and, after a dispositional hearing in which the parents admitted they

were homeless, the trial court adjudicated E.F. a CHINS. After E.F.'s birth in May 2013, the parents' visitation increased up to five hours per week. The parents would meet with E.F. alone for one hour per week and then would spend two hours with all of the children twice per week. Dickerson found that the parents generally would miss about two visits per month for a variety of reasons, including transportation issues. DCS moved visitations to the Court Appointed Special Advocate ("CASA") office, and around that time the parents started having difficulty finding transportation for visits because their car had been impounded. However, the parents missed visits with E.F. two times more than the visits with all of the children. Based on the missed visits, Heath implemented a rule that the parents had to come to visits early so that she would have time to provide the foster parent with notice if they were not going to arrive for visitation.

[18]     When E.F. was born, the parents attended his well-child check, which occurred shortly after he was born. There, Mother changed E.F.'s diaper and took an "extraordinary amount of time to accomplish that." (Tr. 575-76). She inspected his genital area and put diaper cream on his genitals "multiple times." (Tr. 576). Because E.F. was left exposed to the air, he urinated on himself, and she had to clean up the urine and reapply the diaper cream. Both FCM Hall and Father told Mother "multiple times" to finish changing the diaper, but she did not listen. (Tr. 576). FCM Hall felt that Mother "showed no empathy" to E.F.'s "hysterical crying." (Tr. 576).

[19] Also when E.F. was born, the parents had to move out of the Vincent House, so they moved into their house on Webster Street. Due to the condition of their house there, the parents would not let FCM Hall visit the house until November 2013. Prior to that time, in June 2013, the City of Fort Wayne's Neighborhood Code Enforcement ("NCE") received a call regarding debris on the parents' property. The caller also suspected that there was an issue with the property's utilities. NCE investigated the allegations and verified that the property did not have utilities. It issued a "Condemn and Vacate Order" on June 5, 2013, giving the parents a deadline to fix the problems cited. The parents fixed the problems, and the "Condemn and Vacate Order" was lifted on July 3, 2013.

[20] In July of 2013, DCS placed visitation on hold because five-year-old L.B. disclosed multiple instances of abuse during his individual therapy and began to have increased negative behaviors during his visitations. Specifically, L.B. disclosed that the parents had exposed him to a "humping movie" and that he had witnessed his parents "humping." (Tr. 293). He said that after watching the humping movie, the parents had asked him to perform "acts" upon them, which he did not describe. (Tr. 293). Also, he said that Father had once told him to "pull his sister S.F. on top of him and hump her" and had, on another occasion, pulled down L.B.'s pants and underwear. (Tr. 294). L.B. refused to discuss Father pulling down his pants and underwear any further. In a similar vein, during one visitation Heath observed L.B. crawl under the table, "put his

face in his mother's groin[,] and ma[k]e mouthing movements as if he were eating[.]" (Tr. 296).

[21] In addition, L.B. disclosed instances of non-sexual abuse. He said that on one occasion "hot, hot, hot water" had been put on him in the shower for making "bad choices" and that on another occasion ice cold water had been poured on him in the bathtub. (Tr. 293). He also said that Father had held his head under the water in the bathtub once and had knocked him off of the bed on another occasion.

[22] After making his disclosures in therapy, L.B. started to act out more in his foster home. He also began to have more nightmares after visits with the parents and began to urinate on himself during the day and night. He wet his bed on average between four and five time per week, urinated in his closet, and urinated on his bedroom floor. Heath, who was L.B.'s individual therapist, gave him a teddy bear to help him ward off bad dreams. When visitations stopped, L.B. gave Heath the teddy bear back and said he did not need it any longer. Also, within two weeks of visitation ending, L.B. ceased to urinate in his bedroom during the day or night.

[23] Subsequently, DCS scheduled a forensic interview of L.B. and substantiated his allegations of sexual abuse. As a result, on July 15, 2013, DCS filed an additional petition alleging that the children were in need of services.[3] On

---

[3] DCS then filed an amended petition on August 21, 2013.

October 24, 2013, the trial court adjudicated the children as CHINS a second time. However, there is no evidence in the record that Father was ever investigated criminally for the alleged abuse. Mother did not believe the allegations against Father. She believed that L.B. had been molested by a former bus driver and had been questioned so many times that he started to change his story to say that the perpetrator of the abuse was Father rather than the bus driver. However, Mother also admitted that an ex-boyfriend had forced her to perform oral sex on L.B. when he was an infant.

[24] After DCS placed visitations on hold, it continued to work with the parents to help them meet their court-ordered requirements. Ronald J. Furniss ("Furniss"), a clinical therapist with Headwaters Counseling Services, counseled Father from July of 2013 to July 2014, and Therese Chiyoe Mihlbauer ("Mihlbauer"), a staff therapist at Headwaters Counseling Services, counseled Mother from June 7, 2013 until August 20, 2014. Service providers also conducted home visits of the parents' home during the summer of 2013; on November 4, 2013; and in December 11, 2013. They found each time that the house was unsanitary and unsafe. In December, FCM Hall discovered that the parents did not have heat in their house and was concerned because the temperatures were subzero. As a result, she contacted SCAN, and SCAN was able to provide the parents with some space heaters. Around that same time, though, NCE received a second call about the property's utilities, and it issued another "Condemn and Vacate Order." In January, the parents installed an

electric furnace, so they had heat.  Accordingly, NCE lifted the "Condemn and Vacate Order" on January 13, 2014.

[25]     That winter, the parents completed a second round of psychological tests with James A. Cates ("Dr. Cates").  Dr. Cates performed clinical interviews of the parents on November 18, 2013 and full psychological assessments on February 10, 2014.  He was concerned because Father reported that he had experienced several strokes, and Dr. Cates noted some signs that Father was impaired in a manner that was consistent with someone who had experienced a brain injury. Father also reported that he had had six heart attacks and talked about depression and being "stressed out."  (Tr. 132).  Dr. Cates administered the following tests to Father:  (1) the Millon Clinical Multiaxial Inventory-III ("MCMI-3"), which looks at personality disorders and how emotional problems may be manifesting; (2) the Parenting Stress Index, Third Edition; (3) the Wagner Hand Test; and (4) the Rorschach Test.

[26]     Father's results on the MCMI-3 indicated that he was "disengaged from others," "distrust[ed] their motives," lacked clear identity development, and was depressed.[4]  (Tr. 133).  His results on the Parenting Stress Index, which tested his level of stress as a result of parenting L.B., indicated that he perceived L.B. as "exhibiting symptoms consistent with [ADHD]," that he did not see L.B. as adaptable, and that he saw L.B. as "depressed [and] placing significant

---

[4] It is not clear whether Dr. Cates considered this test result valid.  At one point during the termination hearing, he stated that the test result was invalid, but then he later said that it was valid.

demands on him as a parent." (Tr. 134).  The test further indicated that Father "felt competent as a parent" but "still felt stressed and isolated in the role."  (Tr. 135).  Dr. Cates determined, based on Father's responses to the Rorshach Test, that Father demonstrated "fairly clear thought processes" but "ha[d] less ability to manage stress . . . than a lot of people would" and had "some vulnerability in terms of self[-]esteem."  (Tr. 139).  Based on Father's clinical interview and test results, Dr. Cates diagnosed Father with major depressive disorder, alcohol use disorder in sustained remission, and possible major vascular neurocognitive disorder—which meant that Father had probably experienced strokes.

[27]  Dr. Cates also interviewed Mother and administered psychological tests to her. He found that some of the things she said in the interview were "in all likelihood absolutely true" but that some things seemed "implausible."  (Tr. 145).  He "really believe[d]" that some of Mother's history was fabricated, although he could not tell how much she believed and how much was a deliberate fabrication.  (Tr. 161).  Mother's results on the MCMI-3 demonstrated that she had a "tendency toward exaggeration of her emotional problems."  (Tr. 147).  As a result of the Wagner Hand Test, Dr. Cates found that she had "some level of anxiety in emotionally charged situations."  (Tr. 153).  He also found that Mother was "likely to show marked tendencies to overvalue her personal worth and to become preoccupied with her own needs at the expense of concern about the needs of others."  (Tr. 158).  He diagnosed her with anxiety, depression, and schizotypal personality disorder, which is a "personality disorder that looks very much like schizophrenia."  (Tr. 160).  He

recommended a psychiatric review and ongoing therapy, including dialectical behavior therapy ("DBT"). DBT "uses . . . a kind of educational approach in a therapy setting . . . to practice skills and supportive case work." (Tr. 163).

[28] In January 2014, the parents had their first permanency hearing, and CASA recommended giving the parents an opportunity to show that they had benefitted from receiving their parenting services. Accordingly, the parents resumed visitation with their two younger children, S.F. and E.F. They did not, however, resume visitation with L.B. as FCM Hall and L.B.'s therapist concluded that it would not be healthy for him to participate. The visits occurred once a week for an hour. DCS put more stringent rules into place for the parents, including that they had to arrive at the visitations half an hour earlier due to their number of prior missed visits. Also, if the parents thought the children needed their diapers changed, the case manager or therapist had to check because the parents could not take off the children's clothes. If the children needed their diapers changed, Mother had to do the changing, and the case manager or therapist had to assist her.

[29] Supervised visitation for the parents continued from January 2014 until August 2014. When visitation resumed that January, FCM Hall made an agreement with the parents that if they had two consecutive "no-shows" for visitation, their visitation would be put on hold. As a result of this rule, she had to place the parents' visitation on hold once in June 2014 and a second time in August 2014. Visitation was never reinstated after it was placed on hold in August 2014.

[30] Meanwhile, the parents continued to struggle with maintaining a clean and safe home. Rex McFarren ("McFarren"), the Allen County CASA Director, and FCM Hall conducted unannounced home visits on April 2, 2014 and May 12, 2014 and found that the parents' home continued to be unsafe and unsanitary. Subsequently, FCM Hall attempted several unannounced home visits but was never able to view the home again. She later testified that there were times when "it would sound like someone was home" and "walking around[,]" but no one would come to the door. (Tr. 557). On one occasion, Mother said that she was upstairs and not feeling well, so she was unable to come and let FCM Hall into the house.

[31] On May 12, 2014, DCS filed a petition to terminate the parents' parental rights to the children. However, thereafter DCS continued to work to help the parents fulfill their court-ordered services. To complete the DBT therapy that Dr. Cates had recommended, Mother met with Charleen Bechtold ("Bechtold"), a skills trainer and individual therapist at the Park Center. The DBT program at the Park Center consisted of four modules that took six months to complete. Bechtold saw Mother for the first time on July 21, 2014. Mother came to the orientation for the program and then picked a group—one component of the program—to attend. She started the group on August 7, 2014 and attended meetings on August 14 and 21, 2014. She then cancelled her meeting on August 28, 2014 and never came back. Mother met with Bechtold for individual therapy on August 7 and 11, 2014, but she cancelled her August 28, 2014 appointment and did not came back for individual therapy, either.

[32] On August 19, 2014, NCE received another call about the parents' house's utilities, and it issued another "Condemn and Vacate Order" on August 21, 2014. The parents were not able to turn the utilities on due to an outstanding utility bill of $3,000. As a result, they were required to move out of the house and went to live with a friend in their friend's trailer in Bristol, Indiana.

[33] The trial court held a termination hearing on DCS' petition to terminate the parents' parental rights on September 22, 23, and 29, 2014, as well as on October 7 and 23, 2014. At the hearing, Starnes, the parents' home-based skills and parenting service provider, testified about the parents' completion of their services. She said that when she met Mother, Mother had admitted that she did not know how to cook or clean. Accordingly, they had worked on both of those skills, and Starnes had seen "an improvement" over time. (Tr. 32). Starnes also said that the parents had completed six of the parenting curriculums. She testified that they had occasionally missed sessions with her, either as a result of illness or work conflicts, but "for the most part" had attended classes. (Tr. 18). However, according to Starnes, they had "struggled a lot" with getting their homework done, (Tr. 18), which she thought that showed a "lack of follow through." (Tr. 19). Also, Mother had been able to repeat what she had learned from Starnes, but Father had not been able to "as much as [Mother.]" (Tr. 20).

[34] Next, the parents' visitation supervisors each testified and described their observations from the parents' visits with the children. Heath said that before E.F. was born, L.B. had frequently acted like he was the primary caregiver for

S.F., who was one year old. L.B. would give S.F. drinks and redirect the parents in caring for her. When the family sat down to eat, L.B. would try to take the silverware and feed S.F., and he would tell the parents to change her diaper if it needed to be changed. To Heath, it had been "very obvious that [L.B] had been the caregiver for [S.F.]." (Tr. 276-77). She said that L.B. had also made statements indicating that the parents expected him to assume this role of caretaker.

[35] In addition, Dickerson testified that the parents had not been very observant of S.F. at times, and she would be "roaming around, climbing onto things," so that Dickerson or Heath usually had needed to attend to her wherever she was. (Tr. 94). Heath said that she had also had to redirect the parents because they had put S.F. in timeout in a corner as discipline. She did not believe that timeout was an age-appropriate disciplinary technique for a one-year-old child.

[36] Heath also noticed that the parents had had "an overwhelming focus to change the diaper often times during the visit[s]." (Tr. 277). She testified that the parents had spent "a lot of time spent applying salve to the genital regions of S.F. during the diaper changes" and there were restroom breaks in which Heath had "had to redirect because of parental involvement in examining L.B.'s penis." (Tr. 277). She said the parents had made "constant remarks about bites or marks on the genital area[s] of the children that [Heath] [had] not [been] able to observe." (Tr. 278). Similarly, Dickerson testified that she had noticed that the parents would talk about the children's bottoms being red, but "would put

[]A&D [o]intment all over the genital area more than they did the bottom where the redness was[.]" (Tr. 92).

[37] Heath said that, after E.F.'s birth, the parents' visits had become more "difficult" and frequently the visitation supervisors, rather than the parents, had been compelled to keep track of the children if they wandered off. (Tr. 281). She said that Mother had breastfed E.F. during visits and had also wanted to pump her other breast at the same time. As a result, she had frequently needed Father's help, and Heath and FCM Hall had been required to take care of L.B. and S.F. while the parents focused on E.F. Heath and FCM Hall also testified that they had needed to redirect Mother concerning the breastfeeding. Specifically, Heath said that on one occasion, she had observed L.B. assemble Mother's breast pump by himself and put it on Mother's breast, which Heath did not find appropriate. She also testified that she had had to tell Mother to cover herself because she would breastfeed in the "main area" of the Vincent House, a family homeless shelter, with her top taken off all the way down to her waist so that she was topless. (Tr. 593). FCM Hall said that she and Heath had kept telling Mother to put a blanket over herself, and that in the end they had needed to put the blanket on her themselves. After they had placed the blanket on her, she had continued to "move enough so that it would fall off." (Tr. 593). Eventually, though, Mother had been required to stop breastfeeding due to concerns about her medication in the milk.

[38] April Squadrito ("Squadrito"), a CASA volunteer who was assigned to represent the interests of the three children, also testified. She said that she had

attended the parents' visit at Whitington Homes on February 4, 2013 and then at the CASA office on May 23, 2013 and June 20, 2013. Squadrito testified that she had thought that the May 23, 2013 visit was "chaotic." (Tr. 472). She also said that during the June 20, 2013 visit, she had observed the parents change the diapers of the two youngest children. Instead of putting the diapers in the trash, she had seen them throw the diapers about fifteen feet across the floor. One had bounced off of the wall and into the trash, and the other one had landed in the kitchen. According to Squadrito, the parents had picked up the diaper from the kitchen. However, she said that neither one had washed their hands after that incident, and there "[had been] food products still out for the children and they [had been] still handling the children." (Tr. 473). She had found parents' actions "absolutely unacceptable." (Tr. 473). In addition, Squadrito noted that during these visits "not only [had] the parents [been] involved with the children but the supervisors [had] seemed to need to be consistently involved because there was so much going on all the time." (Tr. 475).

[39]     Later in the hearing, Angel Metro ("Metro"), a therapist with Whitington Homes, and Jared Pulley ("Pulley"), a case manager for Whitington Homes, testified about the parents' participation in the visitation after it was reinstated in January 2014. Metro had supervised visitation from February 2014 until August 2014, and Pulley had supervised visitation from May 2014 until August 2014. Metro said that the parents had not always recognized the children's nonverbal communications. For example, she said that there had been a few times when Father had played a game with S.F. where he had made a biting

motion towards her. Sometimes S.F. had engaged with Father and gone towards him, but sometimes she had pulled away and Father had continued to make the biting motion even though she had pulled away. Similarly, Pulley testified that Father had "kiss[ed] S.F. a lot"—"sometimes on the forehead" and "sometimes on the lips." (Tr. 218). Pulley had observed times when S.F had turned away from Father and put her hand up to block him, but Father had continued to make "several attempts" to kiss her before stopping. (Tr. 219).

[40] Metro testified that from February 2014 to August 2014, she had not seen any improvement in the parents' parenting skills; they just "kind of stayed the same." (Tr. 256). She noted that the parents had brought age-appropriate toys for the children to their visits. However, she said that during one visit, she had had to redirect Father for his language and reaction because he had seen a cut on E.F.'s face and yelled "What the f**k?" (Tr. 219). She testified that Father had "not [been] accepting of what she had to say" when she redirected him. (Tr. 219). Finally, Metro told the court that she and Dickerson had never been able to recommend unsupervised visitation because they had always thought there had been "an ongoing need to have that observation and assessment[,]" as well as some prompting or intervention. (Tr. 244).

[41] In addition, Dr. Ahmad, Furniss, and Mihlbauer testified to the parents' completion of their court-ordered mental health requirements. Although Dr. Ahmad said that he had seen the parents six times between March 2013 and July 2014, he also said that he had not seen them at all for the six-month period between November 2013 and May 2014. He was not sure why he had not seen

the parents for six months, although he was sure that he would not have scheduled a six-month break for a DCS client. His testified that his normal policy was to schedule appointments two months apart, at most. Mother later argued that the parents had tried to schedule an appointment but had not been able to do so because Dr. Ahmad had constantly been booked.

[42] In addition, Dr. Ahmad said that, throughout their doctor-patient relationship, he had found that Father had been frequently non-compliant with his medication for his generalized anxiety disorder. Father would stop taking his medication because he could not afford it, and then he would struggle with his anger issues more when he was off of his medication. Mother had been more compliant with her medication, but Dr. Ahmad believed that both had likely gone several months without their medications when they had had their six-month break between appointments.

[43] Furniss testified that he had attempted to schedule counseling sessions with Father once every week or two. However, he said that Father's attendance had been sporadic "in that there [had been] extended periods of weeks or months at a time" when Father had not scheduled to meet with him. (Tr. 372). According to Furniss, Father had also cancelled four appointments and failed to appear for three appointments. In total, he had attended thirty-one out of thirty-eight scheduled visits over the year.

[44] Furniss said that he had attempted to work with Father on his self-reported anger issues, but that his progress had been limited because Father had

"continued to report a lack of time [and] a lack of energy to implement[] the things that [they] were talking about in session due to [a] heavy work schedule, [and] due to time lapses in his lifestyle and routine." (Tr. 374). Father had also failed to consistently complete the written assignments Furniss had given him. As a result, Furniss said, Father had not been able to put into practice the things he had talked about with Furniss.

[45] Finally, Furniss testified that in therapy, there had been a "continual lapse of conversation" and "periods of silence" whenever Furniss had tried to discuss subject matter relevant to Father's situation. (Tr. 375). Furniss said that the last time he had met with Father had been on July 1, 2014. After that session, Furniss had told Father that if he was ready to work on substantive issues, he would schedule another session, but he would not schedule another session until Father had decided he was ready to proceed. Furniss said that Father never scheduled another appointment with him.

[46] Mother's therapist, Mihlbauer, also testified regarding Mother's completion of therapy. She said that, in total, Mother had completed forty-one therapy sessions over the fourteen-month period that she had met with Mihlbauer. She had cancelled fifteen appointments—eight as a result of illness or medical issues and seven for a variety of other reasons—and had failed to appear at three additional appointments. Mihlbauer testified that she had tasked Mother with writing down her life story up until the age of eighteen, but Mother had only completed the assignment up through the age of twelve before she had discontinued her counseling. Mihlbauer further said that, throughout Mother's

counseling, her "lack of stability [had] continue[d] or [gotten] worse as opposed to go[ne] down." (Tr. 415). For instance, Mihlbauer said that towards the end of their sessions in July of 2014, Mother had reported that she was having suicidal thoughts.

[47] Squadrito, FCM Hall, and Rex McFarren testified next to what they had observed when they conducted home visits of the parents' Webster Street residence. Squadrito said that she and a SCAN representative, Cindy Scott, had conducted the first home visit of the property in the summer of 2013. At that time, Squadrito had observed that the house had been "in need of great repair." (Tr. 479). According to her, the parents had owned a cat with fleas, so there had been fleas throughout the house, as well as diatomaceous earth—a flea treating powder—all over the floor. There had been boxes and other items stacked all over every flat surface, and the cat's litter box had looked like it had not been cleaned out in a long time. The kitchen "really [had been] filthy." (Tr. 480). Further, she said that there had been a hole in the ceiling of the kitchen and an "enormous hole" on the back porch. (Tr. 480). Squadrito said that she had found the bathroom so dirty that it had been "really not describable." (Tr. 481).

[48] FCM Hall testified that she subsequently conducted a home visit on November 4, 2013. She said that the SCAN home-based worker had helped the parents organize their home for the visit, but in spite of the fact that the house had been organized, she had found that there were some safety issues. For instance, in S.F.'s bedroom there had been electrical wires hanging out of the wall within

reach of S.F.'s crib; the floor of the home had appeared to have drywall putty in different places; and there had been splinters and nails sticking out of the floor. FCM Hall said that she had provided the parents with a written list of the areas that needed to be fixed.

[49] Next, FCM Hall testified that she had returned for an unannounced visit on December 11, 2013. At that point, there had not been any heat inside. She had been wearing her winter coat and had been "very cold just being in the home." (Tr. 552). There had been food wrappers, dirty dishes, and items on almost every countertop, tabletop, and floor throughout the home. The cat's litterbox had been very full, and the home had smelled "very strongly of pet urine and pet feces." (Tr. 553).

[50] Squadrito testified that she had visited the parents in December 2013, also. She had observed that the diatomaceous earth was gone, but it had been apparent that the house was still flea-infested because Mother had had flea bites on her legs. There had also been "endless boxes piled all over" still, but the parents had done some work on the stairways, the kitchen had looked better, and the hole in the ceiling had been gone. (Tr. 490). However, the house had still been "very cluttered" and the cat litter box had still been "filthy." (Tr. 482). There had been piles of dirty dishes, and food and pop cans had been on the floor.

[51] Rex McFarren ("McFarren"), the Allen County CASA Director, testified that he and FCM Hall had conducted an unannounced home visit on April 2, 2014 and found the parents' house "very unsafe." (Tr. 554). McFarren said that if

the children had not already been out of the home at that point, he would have set an emergency court hearing to ask for them to be removed. He had found "every surface in the house [] covered and layered [with] things stacked upon each other." (Tr. 435). There had been bags of clothes and trash in the kitchen, and the floors had all been "seriously dirty." (Tr. 435). Prescription bottles had been on the floor, dirty pans had been stacked on the stove and the counters, plates with food still on them from the night before had been sitting out, and one or two steps at the bottom of the basement stairs had been covered with loose nails from a box that had fallen and broken open. In the bedroom, there had been a five gallon plastic bucket that Mother had used as a chamber pot because it was difficult for her to make it from the bedroom to the bathroom. The bucket had "contained human urine and feces that still had not been dumped by late morning." (Tr. 436). FCM Hall also testified that she had noticed during this visit that the wires in S.F.'s room were still coming out of the wall.

[52]  Next, FCM Hall testified that she had gone back out to the house again on May 12, 2014. She said that, at that point, the parents had moved all of the items that had been in the living room into the dining room, and Father had been trying to sand the floors. Otherwise, the condition of the rest of the house had been very similar to previous home visits. She had found that the bathroom was "very unclean" and had "an extremely strong smell of mold and mildew" such that she could not stay in the room because it was hard for her to breath. (Tr. 557). In addition, it had appeared that the toilet had been leaking and that

the parents had put a towel around its base.  Subsequently, according to FCM Hall, she had never been able to conduct an unannounced home visit again because parents had not answered the door when she stopped by or because Mother had not been able to come to the door.

[53] McFarren, Squadrito, and FCM Hall each recommended that the court terminate the parents' parental rights.  McFarren said that he "truly believe[d]" that termination was in the children's best interests, (Tr. 438), and Squadrito believed that there was "no way that [the parents] could raise the children without some form of very negative outcome." (Tr. 487).  FCM Hall recommended termination and estimated that the parents had been offered "well over" five hundred hours of services and still were not able to suitably parent the children. (Tr. 601).  Similarly, Heath testified that she had not seen any improvement in the parents during the time she had supervised visitation.  She believed that the court should terminate their parental rights because the children "need[ed] a right to permanency" as well as "a safe and stable loving home that [could] be supported by a healthy living environment." (Tr. 300).

[54] Mother and Father testified to their living situation at the time of the hearing and said that they were still living with their friend in her trailer in Bristol, Indiana.  They said that they had decreased their past-due utility bill for their Webster Street house to $1,700 and would be able to move back into the house when they had paid that bill and NCE lifted its "Condemn and Vacate Order." In the meantime, the parents said that there was room for the children in their friend's trailer.

[55] The parents also testified regarding their lack of employment. Mother said that she had not been employed since 2007 and that she received $720 per month from Supplemental Security Income ("SSI"). She had been receiving SSI since she was twelve years old as a result of her previous diagnoses for ADHD, bipolar disorder, depression, Asperger's syndrome, and kidney disease. She said that prior to the hearing, SSI had conducted a medical review and planned to stop her payments, but she was in the process of appealing its determination. Father was in-between construction contracts at the time of the hearing but testified that he planned to start working again once the hearing was over. He performed construction work, including work involving pipefitting, plumbing, sheetrock, concrete, and carpeting. He said that he had experienced trouble maintaining work during the CHINS proceedings as a result of attempting to fulfill the court-ordered requirements.

[56] At the conclusion of the hearing, the trial court took the matter under advisement. Then, on January 22, 2015, it issued an order terminating the parents' parental rights to the children. It held that there was clear and convincing evidence that there was a reasonable probability that the parents would not remedy the factors that had led to the children's placement outside of the home. Specifically:

> Despite multiple services and family team meeting[s], the parents
> have not demonstrated an ability to benefit from services. They
> have not completed therapy and have not demonstrated an ability
> to maintain safe, stable housing. They have not visited with
> the children since late August 2014. The parents have not
> completed psychosexual assessments. None of the therapeutic

> visitation supervisors have recommended that the parents['] contact with the children be expanded. They have not yet been able to restore their relationship with the eldest child and the issues with regard to sexual abuse have not yet been addressed.

(Father's App. 25).

[57] The trial court also concluded that termination was in the children's best interests. The court again noted that L.B. had suffered multiple traumas in the parents' care and reasoned that it was best not to place the youngest child in an environment where those issues had not been resolved, either. The trial court also noted that L.B. and S.F. had evidenced special needs under the parents' care but had not done so once they were removed from the parents. Finally, the trial court noted that the CASA Director, McFarren, and the CASA volunteer, Squadrito, had both concluded that termination was in the children's best interests. Mother and Father now appeal.

# Decision

[1] On appeal, the parents argue that DCS did not present clear and convincing evidence that they would not remedy the conditions that had resulted in the children's removal or continued placement outside of their care. In addition, Mother argues that DCS did not present clear and convincing evidence that there was a reasonable probability that the continuation of her parent-child

relationship would pose a threat to the children's well-being or that termination was in the children's best interests.[5]

[2]   "[W]hen seeking to terminate parental rights, DCS must prove its case by 'clear and convincing evidence[.]'" *In re E.M.,* 4 N.E.3d 636, 642 (Ind. 2014) (quoting IND. CODE § 31-37-14-2). This Court will "consider only the evidence and reasonable inferences therefrom that support the [court's] judgment" terminating parental rights. *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1229 (Ind. Ct. App. 2007). We will not "reweigh the evidence or reassess the credibility of the witnesses" during our review. *Id.*

[3]   When reviewing findings of fact and conclusions thereon in a case involving a termination of parental rights, we apply a two-tiered standard of review. *In re M.W.*, 943 N.E.2d 848, 853 (Ind. Ct. App. 2011), *trans. denied.* First, we determine whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A trial court's judgment is clearly erroneous if the findings do not support its conclusions or the conclusions do not support the judgment. *Id.* Although the "Fourteenth Amendment to the United States Constitution gives parents the right to establish a home and raise their children[,]" this right "is balanced against the

---

[5] Mother and Father filed separate appellate briefs. Father challenges only the trial court's conclusion concerning whether the conditions that led to the children's removal would be remedied, not whether his relationship with the children posed a threat to their well-being or whether termination was in their best interests.

State's limited authority to interfere for the protection of the children." *Prince*, 861 N.E.2d at 1229.

[4] The State shall terminate a parent's rights if it demonstrates by clear and convincing evidence, in relevant part, that:

> (B) . . . one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> *        *        *
>
> (C) . . . termination is in the best interests of the child.

I.C. §§ 31-35-2-4 and 31-35-2-8.

[5] Mother argues that DCS failed to present clear and convincing evidence either that the conditions that led to the children's removal would not be remedied or that the continuation of the parent-child relationship posed a threat to the well-being of the children. Our supreme court has stated that DCS need prove only one of those two elements by clear and convincing evidence in termination proceedings. *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005) (holding that if the court finds that the parent would not remedy the conditions for removal, there is no need to prove the threat to well-

being element). In addition, Father did not raise the second element. Therefore, in addition to Mother's argument regarding the children's best interests, we will address only the parents' argument regarding whether DCS proved that the conditions that led to the children's removal would not be remedied.

### 1. Conditions Remedied

First, the parents argue that DCS did not present clear and convincing evidence that the conditions that led to the children's removal from their home and continued placement outside of their home would not be remedied. They argue that the trial court's findings regarding this statutory factor were not supported by the evidence. Specifically, they challenge: (1) the trial court's finding that they had not demonstrated an ability to benefit from services; and (2) the trial court's finding that they had not been able to maintain safe, stable housing.

In determining whether the reasons for the children's removal and continued placement outside the home will be remedied, "[w]e engage in a two-step analysis." *In re K.T.K*, 989 N.E.2d 1225, 1231 (Ind. 2013). We first look at the conditions "that led to their placement and retention in foster care[,]" and then "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.,* 934 N.E.2d 1127, 1134 (Ind. 2010) (additional citation omitted)). "[T]he trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester*, 839 N.E.2d at 152. The trial court also has the discretion "to weigh a parent's prior history more heavily

than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.* Therefore, "DCS need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay. L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is impaired before terminating the parent-child relationship. *Matter of C.M.*, 675 N.E.2d 1134, 1139 (Ind. Ct. App. 1997).

[8] In support of their argument that the trial court erred in finding that they had not demonstrated an ability to benefit from services, the parents note that FCM Hall and Starnes testified that they saw improvement in the parents' skills, and Mother contends that she benefitted from services and changed her style of discipline to a more appropriate style. However, we conclude that the parents' arguments are a request for us to reweigh the evidence, which we will not do. *See Prince*, 861 N.E.2d at 1229. Although, as the parents note, FCM Hall and Starnes testified that they saw improvements in the parents' skills, there was also evidence that the parents did not benefit from services. Heath testified that she did not see an improvement in the parents during the time that she supervised visitation. In addition, even though the parents received numerous services on cleaning and home-making, every service provider that visited their house before it was condemned found that the house was unsanitary.

Accordingly, we conclude that there was evidence to support the trial court's finding.

[9] As for the parents' argument that the trial court erred in finding that they had not been able to maintain safe, stable housing, the parents argue that the trial court should have taken into account the fact that their housing circumstances had improved over the course of the CHINS proceedings. Specifically, whereas at the beginning of the CHINS proceedings they had been homeless, by the end of the proceedings they had a house and had made numerous upgrades and repairs to the house even though they were not living in it. They contend that, at the time of the hearing, they had been making steady progress on paying off their utility bill and had planned to have the electricity in their house turned back on shortly after the hearing. They also note that, in spite of the fact that they were not living in their house, they were living in a trailer that was appropriate for the children instead of the homeless shelter where they had previously lived.

[10] However, we conclude that the improvements the parents may have made are not dispositive. As we stated above, the trial court had the discretion "to weigh [the parents'] prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. In addition, the trial court was required to consider the parents' "habitual pattern of conduct to determine whether there [was] a substantial probability of future neglect or deprivation." *Bester*, 839 N.E.2d at 152.

[11]   Accordingly, the parents' argument is essentially another request that we reweigh the evidence. Although, as they noted, there was evidence of a slight improvement in their housing situation throughout the CHINS proceedings, they were still unable to maintain stable housing. Throughout the CHINS proceedings, they lived in at least six different locations. At the time of the termination hearing, they were living in a friend's trailer and were unable to reside in their own home until they paid off their utility bill. Although Mother and Father planned to have the electricity restored, they were still at least $1,700 away from having it turned on, and they had not demonstrated that they could maintain the electricity once it was on. Further, as stated previously, every service provider that visited their house before it was condemned said that it was unsanitary and still required safety repairs. Thus, even though the parents had spent time updating and repairing the house, it still was not in appropriate condition for children. As a result, we conclude that the trial court did not err in finding that the parents had not been able to maintain safe, stable housing. Because the parents do not otherwise challenge the findings that supported the trial court's conclusion that the conditions that led to the children's removal would not be remedied, we conclude that the trial court's conclusion was not erroneous.

## 2. Best Interests

[12]   Next, Mother argues that we should reconsider the trial court's conclusion that terminating her parental rights was in the children's best interests. However, she does not cite any reason we should reconsider the trial court's conclusion,

nor does she cite to any legal authority to do so.  It is well-settled that we will not consider an appellant's assertion on appeal when she has not presented a cogent argument supported by authority and references to the record as required by the rules.  *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003); Ind. App. Rule 46(A)(8)(a).  Additionally, "'[w]e will not become an advocate for a party nor will we address argument[s] which are either inappropriate, too poorly developed or improperly expressed to be understood.'"  *Thacker*, 797 N.E.2d at 346 (quoting *Ramsey v. Review Bd. of Ind. Dep't of Workforce Dev.*, 789 N.E.2d 486, 486 (Ind. Ct. App. 2003)).  Therefore, to the extent Mother challenges the children's best interests, we find that she has waived her claim on appeal by failing to support it with a cogent argument.  *See A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 n. 4 (Ind. Ct. App. 2013) (stating that failure to make a cogent argument results in waiver), *trans. denied*.[6]

[13]     Affirmed.

Vaidik, C.J., and Robb, J., concur.

---

[6] In addition, we note that Mother's claim does not have merit because she had a history and a "current inability to provide stable housing and because FCM Hall and other providers testified that termination was in the children's best interests.  *See Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) ("'[a]parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that the continuation of the parent-child relationship is contrary to the child's best interests.'") (quoting *Matter of Adoption of D.V.H.*, 604 N.E.2d 634, 638 (Ind. Ct. App. 1992), *trans. denied*); *A.J. v. Marion Cnty. Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008) (holding that the recommendations of a child's caseworker that parental rights should be terminated can support a finding that termination is in the child's best interests), *trans. denied*.