**In re the Termination of the Parent–Child Relationship of M.W., Minor Child,**

**and**

**M.W., Father, Appellant–Respondent,**

**v.**

**Indiana Department of Child Services, Appellee–Petitioner.**

No. 32A01–1007–JT–322.

Court of Appeals of Indiana.

Feb. 18, 2011.

Transfer Denied May 12, 2011.

---

Paula M. Sauer, Danville, IN, Attorney for Appellant.

Matthew A. Skeens, DCS, LaGrange County Office, LaGrange, IN, Robert J. Henke, DCS, Central Administration, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

M.W. ("Father") appeals the termination of his parental rights to his child, M.W. We reverse.

### Issue

Father raises two issues, which we consolidate and restate as whether the Department of Child Services ("DCS") presented clear and convincing evidence to support the termination of Father's parental rights.

### Facts

M.B. ("Mother") and Father had a child, M.W., who was born in April 2006. Mother and Father initially lived together, but Father moved out in 2008. In July 2008, DCS became involved with Mother and M.W. because Mother had been using morphine, and they entered into an informal adjustment. In September 2008, Mother was arrested for a probation violation, and DCS removed M.W. and placed her in foster care. At the time of the removal, Father was travelling outside of the State for his employment. DCS filed a petition alleging that M.W. was a child in need of services ("CHINS"), and Mother agreed that M.W. was a CHINS.

Shortly thereafter, Father was incarcerated on charges of intimidation and false informing. In October 2008, Father was found guilty of Class D felony intimidation and Class B misdemeanor false informing for actions he committed prior to the start of the CHINS action. He was sentenced to 365 days in jail with 275 days suspended and 245 days on probation.

In December 2008, the trial court in the CHINS action ordered Father to participate in a variety of services, including: cooperate with the DCS and service providers and follow all recommendations; participate in home based services; complete a psychological evaluation and follow all recommendations; participate in visitation with M.W.; reimburse DCS for the cost of services; resolve all pending criminal matters; submit to random drug screens; obtain a drug and alcohol assessment and follow all recommendations; participate in a domestic violence class; and establish custody in a court proceeding.

In February 2009, the DCS case manager advised Mother that a petition to terminate her parental rights "could be filed [after] fifteen months if she failed to follow through with the services recommended." Tr. p. 106. In March or April 2009, the DCS internally decided to move toward termination of Mother and Father's parental rights. However, in late April 2009, the DCS filed a permanency plan listing reunification with Mother and Father as the plan for M.W., and in early May 2009, the trial court approved that permanency plan. Despite the approved plan, on May 18, 2009, the DCS filed a petition to termi-

nate Mother and Father's parental rights to M.W.

In May 2009, the DCS also filed a contempt petition against Mother and Father. Regarding Father, the DCS case manager testified that Father had failed to establish court-ordered custody of M.W., failed to provide documentation of his mental health evaluation, failed to show up for random drug tests, and failed to consistently visit with M.W. The trial court found Father in contempt and ordered him to strictly comply with the prior orders.

Father was incarcerated from May until early August 2009, after he was sentenced to serve 180 days for a probation violation. Father contacted DCS immediately upon his release and requested permission to see M.W., but DCS denied his request. At a hearing on August 6, 2009, DCS requested permission from the trial court to discontinue services, and the trial court granted that request.

In September 2009, the trial court held a hearing on DCS's petition to terminate parents' parental rights. Both Father and Mother appeared for the hearing. At the end of the first day of the hearing, the trial court informed DCS that it had "a really serious problem with [DCS] telling these [parents] on a day certain in April that their plan is to reunify them and then without any justifiable reason filing a termination" petition. *Id.* at 163–64. The trial court stated that the DCS's procedure was "not professional[ ]." *Id.* at 164. The trial court noted that, as of that time, the DCS had not met its burden of showing by clear and convincing evidence that the parents' rights should be terminated.

On October 1, 2009, the parties filed an amendment to the disposition/parental participation plan ("Amended Plan"), which the trial court approved. The Amended Plan provided, in part:

The parents understand that when a child is out of the parents care for 15 of the past 22 months that it is mandatory that the DCS file for termination of parental rights. Upon entering this agreement, DCS agrees to continue the present TPR.... The parents are being given one last chance to STRICTLY COMPLY with the terms of the orders.... If the parents fail to STRICTLY comply, DCS will amend its Involuntary Petition for Termination of Parental Rights to include the noncompliance and proceed with the involuntary termination of parental rights....

DCS's Exhibit 5 p. 2. The Amendment required Father to: obtain a suitable residence; continue his employment; cooperate with DCS; participate in home based counseling; comply with recommendations of his psychological evaluation; participate in routine visitations with M.W.; reimburse DCS; resolve his pending criminal matters; submit to random drug screens; comply with the recommendations made in his drug/alcohol evaluation; participate in a domestic violence class; and file a paternity petition. At the time of the Amendment, Father was expecting to be sentenced to home detention in his pending criminal case for Class D felony fraud and Class D felony theft, which related to acts committed prior to the start of the CHINS action.

In November 2009, Father admitted himself to the hospital for treatment of depression and suicidal thoughts. In January 2010, Father turned himself in on the fraud and theft convictions. Although Father was anticipating being sentenced to home detention, Father was sentenced to one year in the Department of Correction. Father was scheduled to be released from jail on July 8, 2010, and to be on parole until December 2010.

The trial court held another hearing on DCS's petition to terminate Mother and Father's parental rights on April 29, 2010. The DCS case manager testified that M.W. was attached and bonded with Father. Father was appropriate in his contact with her during visitations. Father completed anger management classes. He had also been evaluated for domestic violence counseling and was not referred to counseling as a result. Father submitted to random drug screens, and he never had a positive drug screen result. He also obtained a drug and alcohol assessment and followed all recommendations. Father completed a psychological evaluation and complied with all recommendations.

During the pendency of the CHINS action, Father was employed much of the time. Father apparently lost his job due to his incarceration and, when not incarcerated, Father actively sought employment. Before his most recent incarceration, Father was accepted as a student at Ivy Tech.

Father participated in visitations with M.W., but missed some visitations. M.W.'s therapist reported that M.W. expressed positive feedback about visitations with Father. Father kept DCS informed regarding his efforts to resolve his pending criminal matters, and Father had resolved all pending criminal matters except for completing his sentence of incarceration for the fraud and theft convictions. Although Father had completed a paternity affidavit when M.W. was born, Father had recently attempted to file an action to establish paternity and custody of M.W.

Father completed all requirements of the Amended Plan except that Father had failed to reimburse DCS for costs, failed to attend every one of the visitations with M.W., and failed to complete home based counseling. According to the case manager, if Father's parental rights were not terminated, Father still needed to obtain secure housing, steady employment, and participate in the home based counseling.

After the hearing, the trial court entered findings of fact and conclusions thereon terminating Father's parental rights. The trial court found:

9. As of the date of the termination hearing, [Mother] and [Father] participated in minimal visitation whether by reason of their incarceration or lack of interest in the child. Neither [Mother] nor [Father] were employed as of the date of the hearing, [Father] being incarcerated in prison. Neither [Mother] nor [Father] had the ability or means to take care of their minor non-marital child. Neither [Mother] nor [Father] have appropriate residences or means to support the minor non-marital child....

10. The Guardian Ad Litem in this case filed a report on 31 July, 2009, advising the Court that the parental rights of the parties should be terminated.

11. Based upon the entire history of lack of cooperation by the parents with the terms and conditions of the numerous times that they have been given the opportunity to reunite with [their] minor non-marital child, this Court finds it is unlikely that the continued reasons for removal are soon to be remed[ied] and that the Department of Child Services has an adequate plan for the care and treatment of the minor non-marital child, [M.W.].

THEREFORE, THE COURT FINDS that based upon the entire history of this case, the Indiana Department of Child Services has prove[n] by clear and convincing evidence that parental rights in the non-marital child, [M.W.],

in [Mother] and [Father] should be terminated.

App. p. 90–91. Father now appeals.[1]

## Analysis

 Father argues that DCS failed to present clear and convincing evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind.2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize of course that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264–65 (Ind.Ct.App.2004), *trans. denied*). Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *D.D.*, 804 N.E.2d at 265).

 When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting PCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

Indiana Code Section 31–35–2–8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31–35–2–4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31–35–2–4(b)(2)[2] provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part, that:

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

---

1. The trial court also terminated Mother's parental rights, and we address her appeal of the termination separately. *See In re M.W.*, 942 N.E.2d 154 (Ind.Ct.App.2011).

2. Indiana Code Section 31–35–2–4 was amended effective March 12, 2010 by Pub.L. No. 21–2010, § 8. However, the amendment is not applicable here.

854

The State must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind.1992).

We first address Father's argument that the trial court's findings of fact and conclusions thereon are lacking because the trial court did not specifically conclude that termination was in M.W.'s best interest. Indiana Code Section 31–35–2–4(b)(2) requires DCS to prove by clear and convincing evidence that termination is in the best interests of the child. We have held that, although trial courts are not statutorily required to enter findings of fact and conclusion thereon in termination of parental rights cases, "the rights involved are of constitutional magnitude," and "a judgment terminating the relationship between a parent and child is impossible to review on appeal if it is nothing more than a mere recitation of the conclusions the governing statute requires the trial court to reach." *In re A.K.*, 924 N.E.2d 212, 220 (Ind.Ct. App.2010), *trans. dismissed*. Thus, we require trial courts to "enter findings of fact that support the entry of the conclusions called for by Indiana statute and the common law." *Id.*

In *A.K.*, the trial court's order merely recited the statutory requirements for termination and did not include any findings of fact to support those conclusions. We remanded to the trial court for the entry of factual findings to support the order. Here, unlike in *A.K.*, the trial court did enter findings of fact and merely failed to include a statement that termination was in M.W.'s best interest. Despite the trial court's failure to state this conclusion in its order, given the trial court's findings of fact and ultimate grant of termination, we have enough information to review the trial court's termination of Father's parental rights on appeal. Consequently, we will address Father's other arguments rather than remand for the entry of a new order.

 Father argues that the trial court's findings and conclusions are clearly erroneous regarding whether there was a reasonable probability that the reasons for placement outside Father's home will not be remedied.[3] In making this determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind.Ct.App.2001), *trans. denied*. However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* The trial court can properly consider the services that the State offered to the parent and the parent's response to those services. *In re C.C.*, 788 N.E.2d 847, 854 (Ind.Ct. App.2003), *trans. denied*.

Father relies upon *In re J.M.*, 908 N.E.2d 191 (Ind.2009), which we find similar to the circumstances here. In *J.M.*, both the mother and father were incarcerated on methamphetamine-related charges in 2004, and their child was ultimately found to be a CHINS. A petition to terminate the parents' parental rights was

3. Indiana Code Section 31–35–2–4(b)(2)(B) is written in the disjunctive. Consequently, the DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the child. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n. 5 (Ind.2005); *In re T.F.*, 743 N.E.2d 766, 774 (Ind.Ct.App.2001), *trans. denied*. The trial court here did not find that the continuation of the parent-child relationship posed a threat to M.W.'s well-being.

filed, and a hearing was held in early 2008. The trial court denied the petition to terminate parents' parental rights, and the guardian ad litem appealed. Our supreme court affirmed the trial court's denial of the petition. In particular, our supreme court noted that the father anticipated a release from prison in mid–2008 and that the mother anticipated a release from prison in mid–2009. They were in fact released from prison, participated in available services offered at the prisons, had a relationship with the child, and took steps to provide permanency for the child upon their release from prison. The court noted that parents' "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time." *J.M.*, 908 N.E.2d at 196.

Similarly, here, M.W. was removed from Mother's care due to her incarceration, and Father was incarcerated shortly after M.W.'s removal. Father spent half of the twenty months between M.W.'s removal and the termination hearing incarcerated, and he was due to be released shortly after the termination was ordered. Despite his incarcerations, Father complied with almost all of the requirements of the Amended Plan. Father was bonded with M.W., was appropriate during visitations, completed anger management classes, was evaluated for domestic violence counseling, submitted to random drug screens, obtained a drug and alcohol assessment and followed all recommendations, and completed a psychological evaluation and complied with all recommendations. At all times Father was not incarcerated, he was either employed or actively seeking employment. Father resolved all of his criminal matters except for completing his final sentence of incarceration. Prior to his incarceration, he was accepted as a student at Ivy Tech, and he had been attempting

to file an action to establish paternity and custody of M.W.

The DCS case manager testified that Father completed all requirements of the Amended Plan except that Father had failed to reimburse DCS for costs, failed to attend every one of the visitations with M.W., and failed to complete home based counseling. According to the case manager, if Father's parental rights were not terminated, Father still needed to obtain secure housing, steady employment, and participate in the home based counseling.

The trial court focused on Father's incarceration, lack of visitation (some of which resulted from Father's incarceration), lack of employment, and lack of appropriate residence as a basis for termination. However, one of the requirements of the Amended Plan was for Father to resolve his pending criminal matters. Father complied with the DCS but, in the process of doing so, he has been penalized for his required short-term incarceration. Because Father was scheduled to be released soon after the hearing date, as in *J.M.*, Father's "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time." *J.M.*, 908 N.E.2d at 196.

We acknowledge that Father may be unable to quickly establish a stable life. However, Father made many strides toward completing the requirements of the Amended Plan and was scheduled to resolve all of his criminal matters shortly after the hearing. "The involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children." *I.A.*, 934 N.E.2d at 1136. "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* We are not convinced that all

other reasonable efforts have been employed in this case to reunite Father and M.W. Given the evidence presented, we conclude that DCS failed to carry its burden of establishing, by clear and convincing evidence, a reasonable probability that the reasons for placement outside Father's home will not be remedied.[4] *See also In re G.Y.*, 904 N.E.2d 1257 (Ind.2009) (reversing the termination of mother's parental rights where she was scheduled for release from incarceration approximately eighteen months after the termination hearing, mother was bonded with child, mother's crimes occurred prior to the child's birth, mother had addressed her drug issues and participated in available services while incarcerated, and mother was committed to maintaining a parental relationship with the child). Because the trial court's conclusion is clearly erroneous, we reverse the trial court's grant of DCS's petition to terminate Father's parental rights.

## Conclusion

Given Father's efforts to comply with the Amended Plan and his release from incarceration soon after the hearing date, the trial court's findings are not supported by clear and convincing evidence. We reverse the trial court's termination of Father's parental rights.

Reversed.

BAKER, J., and VAIDIK, J., concur.

---

4. Because this conclusion is clearly erroneous, we need not address Father's argument that DCS failed to show by clear and convincing evidence that termination was in M.W.'s best interests.