## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 14 2015, 8:52 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of Parent-Child Relationship of T.M. and A.C., Minor Children and their Father,

J.C.

Appellant-Respondent,

v.

Marion County Department of Child Services,

December 14, 2015

Court of Appeals Cause No. 49A04-1505-JT-387

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge
The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1407-JT-333
49D09-1407-JT-334



*Appellee-Plaintiff.*

**Barnes, Judge.**

# Case Summary

J.C. ("Father") appeals the termination of his parental rights to T.M. and A.C. We affirm.

# Issues

Father raises two issues, which we restate as:

    I.     whether the trial court properly found that there is a reasonable probability that the conditions resulting in the children's removal or the reasons for placement outside Father's home will not be remedied; and

    II.    whether the trial court properly found that termination of Father's parental rights was in the children's best interests.

# Facts

Father and Ta.M. ("Mother") had two children, T.M., who was born in February 2010, and A.C., who was born in December 2011. A.C. tested

positive for marijuana at birth, and the Department of Child Services ("DCS") entered into an Informal Adjustment with Father and Mother. DCS offered home-based case management and therapy, substance abuse services, and "wrap-around" services. Tr. p. 86. Mother refused to participate in most services and left the children in Father's care.

[4] On April 12, 2012, the DCS family case manager went to the home for a scheduled meeting and learned that Father and Mother had been arrested for burglary. With the help of neighbors, DCS located the children and took them into custody. DCS then filed petitions alleging that the children were children in needs of services ("CHINS"), and the trial court later found that the children were CHINS. Although the children were initially placed with relatives, that placement was changed due to domestic violence and substance abuse issues, and the children were placed in foster care. Although Father was ordered to participate in services, DCS was unable to refer him for services due to his incarceration.

[5] In July 2014, DCS filed a petition to terminate Father's parental rights.[1] At the time of the April 2015 termination hearing, Father was still incarcerated for the burglary conviction. Father had been sentenced to ten years, and his earliest release date was January 15, 2017. Father testified that he had participated in a drug treatment program while incarcerated and that he anticipated a six-month

---

[1] Mother signed adoption consents and does not participate in this appeal.

reduction of his sentence. Father also testified that he would be in work release for "a few months" after his release from incarceration. *Id.* at 27. Father had not seen the children since April 2012. The trial court granted DCS's petition to terminate Father's parental rights. Father now appeals.

## Analysis

[6] Father challenges the termination of his parental rights to T.M and A.C. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize of course that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[7] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must

also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[8] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)    that one (1) of the following is true:
>
> > (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

## *I. Changed Conditions*

[9] Father first argues that the trial court's conclusion that the conditions that resulted in the children's removal or the reasons for placement outside his home will not be remedied is clearly erroneous.[2] In making this determination, the

---

[2] Father also argues that the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the well-being of the children is clearly erroneous. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Subsection (b)(2)(B)(iii), which concerns repeated CHINS adjudications, is inapplicable here. Consequently, DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in the children's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the children. The trial court found a reasonable probability that the conditions that resulted in the children's removal and continued placement outside Father's home would not be remedied, and there is sufficient evidence in the record to support the trial court's conclusion. Thus, we need not determine whether there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*.

trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* The trial court can properly consider the services that DCS offered to the parent and the parent's response to those services. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*.

[10] The trial court found:

> 4. Prior to the CHINS filings, the children were the subjects of an Informal Adjustment after [A.C.] was born drug positive.

> 5. During the Informal Adjustment, the children's mother was not being successful in services and wrap around services were provided [Father] to keep the children in-home.

> 6. IDCSMC were not aware that [Father] had relapsed to an opiate addiction. [Father] has battled opiates since 1996.

> \* \* \* \* \*

> 11. After [Father] was arrested on April 10, 2012, he has remained incarcerated, having been convicted of Burglary, and his current out date from prison is January 15, 2017.

12.	[Father] committed Burglary, with the children's mother, after [A.C.'s] birth and while involved with the IDCSMC.

13.	[Father] anticipates receiving a six month reduction in his sentence. In January of 2015, he received a credit time deprivation of ninety days.

14.	[Father] will be on work release after leaving prison.

15.	[Father] has been incarcerated approximately eighteen years since he turned age eighteen. [Father] is now age forty-two.

16.	[Father] would like the children to reside with relatives until he is released from prison. The only relative who came forward during the CHINS case was a maternal aunt with whom the children were placed with prior to their removal for cause. The only other person referred by [Father] was a non-relative who was disqualified from placement due to criminal and Child Protective Services histories.

17.	[T.M.] has not had contact with his father since he was two years and two months old.

18.	[A.C.] has not had contact with her father since she was four months old.

19.	There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their father since that [sic] [Father's] release is not imminent and given his criminal history and long history of opiate issues.

App. pp. 29-31.

[11] Father does not challenge any of the trial court's findings of fact; rather, he challenges only the conclusion that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied. In support of his argument, Father relies on several recent opinions that reversed the termination of parental rights of an incarcerated parent. *See In re K.E.*, 39 N.E.3d 641 (Ind. 2015), *In re J.M.*, 908 N.E.2d 191 (Ind. 2009), *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), and *In re M.W.*, 943 N.E.2d 848 (Ind. Ct. App. 2011), *trans denied*.

[12] In *K.E.*, 39 N.E.3d at 647-49, the incarcerated father was due to be released from prison two years after the date of the termination hearing, the father made substantial efforts to better his life through numerous programs that he completed during his incarceration, and the father had visited with the children during his incarceration and made nightly phone calls to talk to the children. Our supreme court concluded that it was not proven by clear and convincing evidence that the father could not remedy the conditions that caused removal. *K.E.*, 39 N.E.3d at 649.

[13] In *J.M.*, 908 N.E.2d at 194-96, the parents were arrested on dealing in methamphetamine charges, and their four-year-old child was placed in the care of relatives and later in foster care. The trial court denied DCS's petition to terminate the parents' parental rights. Our supreme court affirmed and noted that parents' probable release dates were "close in time," the parents had a

relationship with the child prior to their imprisonment, parents had fully cooperated with services, and the father had secured housing and employment. *J.M.*, 908 N.E.2d at 195.

[14]     Similarly, in *G.Y.*, 904 N.E.2d at 1261-65, our supreme court reversed the termination of a mother's parental rights where, although she was incarcerated, her crimes were committed prior to the child's birth, she took several classes in prison to better herself, she had a positive and consistent relationship with the child, she had made employment and housing plans for after her release, and her release from prison was imminent.

[15]     Finally, in *M.W.*,943 N.E.2d at 855-56, this court reversed the termination of the father's parental rights where the father was resolving his pending criminal matters as required by the parental participation plan, father was scheduled to be released from incarceration soon after the hearing date, father had complied with almost all of DCS's requirements, and father had a relationship with the child.

[16]     Here, Father has had no contact with the children since April 2012.  At that time, T.M. was only two years old, and A.C. was only a few months old.  In August 2013, the trial court denied Father's request for visitation with the children while he was incarcerated.  The trial court directed Father to send any letters for the children to DCS and the letters would be forwarded to the children's therapist.  There is no indication in the record that Father did so.

The DCS case manager testified that she received only one contact from Father in 2014 and 2015.

[17] In addition to his most recent conviction for burglary, Father has prior convictions for robbery and auto theft, and he was incarcerated from 1992 to 1995. Additionally, he was convicted of attempted murder of a law enforcement officer in Tennessee in 1996, and he was incarcerated from 1996 to 2008. According to Father, he is now scheduled for release in July 2016. The State points out that forty-two-year-old Father has been incarcerated for eighteen years of his adult life. Father also has been battling an opiate addiction since 1995 "when [he] was shot." Tr. p. 45. He relapsed shortly before his most recent incarceration, while he was caring for the children.

[18] The cases cited by Father indicate that whether there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied is fact sensitive. Here, Father does not have a relationship with the children, he committed additional crimes after the children were born, he has a lengthy criminal history, and he has a long-term substance abuse addiction. Even after he is released from incarceration, he will be required to complete work release. Given Father's incarceration, uncertain future, lack of relationship with the children, and criminal and substance abuse history, we cannot say that the trial court's conclusion that the conditions resulting in the children's removal or the reasons for placement outside Father's home will not be remedied is clearly erroneous.

## II. Best Interests

[19] Next, Father challenges the trial court's conclusion that termination is in the children's best interests. In determining what is in the best interests of the children, the trial court is required to look at the totality of the evidence. *D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the children involved. *Id.*

[20] The trial court noted that "The children are placed together in a pre-adoptive foster home. They have been observed as being well-bonded with their caregivers who are very engaged and meeting the children's needs." App. p. 31. Further, the trial court found: "Given the father's non-availability and lack of relationship [with] the children, and their current positive placement, the Guardian ad Litem agrees with the plan of adoption to give the children a permanent home with loving parents." *Id.* The trial court concluded:

> Termination of the parent-child relationship is in the best interests of the children. Termination would allow [them] to be adopted into a stable and permanent home where [their] needs will be safely met. As to the children's best interests, [Father] testified he misses his kids and wants to be in their lives. That may be in his best interests but does not address the children's best interests.

*Id.*

[21] On appeal, Father argues that he had a relationship with the children before he was incarcerated, DCS failed to facilitate visits, he has been working to better himself, and the children are currently in a stable home. He contends that he

should be given the opportunity to establish an appropriate home for the children in the near future.

[22] Father's arguments, however, do not focus on the best interests of the children. The children are in a pre-adoptive home and are doing well. Although DCS attempted relative placement, that placement was unsuccessful due to substance abuse and domestic violence. The children were very young when they were removed from Father and have little or no memory of Father. The family case manager and the guardian ad litem both testified that termination was in the children's best interest. The guardian ad litem had little confidence that Father could successfully parent the children after his release given his criminal history and substance abuse history. Given the lack of relationship between Father and children, children's current stable home, and Father's historical instability, we cannot say that the trial court's finding that termination was in the children's best interest is clearly erroneous.

## Conclusion

[23] The trial court's termination of Father's parental rights to the children is not clearly erroneous. We affirm.

[24] Affirmed.

Robb, J., and Altice, J., concur.