## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 31 2015, 8:18 am

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Michael J. Spencer
Monroe County Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorney Generals
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

In the Matter of the Termination of the Parent-Child Relationship of:
K.R. (minor child)

and

T.R. (mother)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 31, 2015

Court of Appeals Case No.
53A05-1507-JT-858

Appeal from the Monroe Circuit Court

The Honorable Frances G. Hill, Judge

Trial Court Cause No.
53C06-1408-JT-488

---

**Pyle, Judge.**

# Statement of the Case

T.R. ("Mother") appeals the trial court's order terminating her parental rights to her minor daughter, K.R.[1] She argues that the trial court abused its discretion when it denied her motion to continue the termination hearing. Alternatively, she argues that the trial court erred when it terminated her parental rights because there was insufficient evidence that the conditions that led to K.R.'s removal and continued placement outside of her care would not be remedied. Because we conclude that Mother did not demonstrate good cause to continue her termination hearing and because the trial court's findings and conclusions supported its judgment that Mother would not remedy the conditions that led to K.R.'s removal, we affirm.

We affirm.

# Issues

1. Whether the trial court abused its discretion when it denied Mother's motion to continue the termination hearing.

2. Whether the trial court erred when it terminated Mother's parental rights to her minor daughter, K.R.

---

[1] K.R.'s father's parental rights are not at issue here as he voluntarily relinquished his parental rights prior to the termination hearing.

## Facts

Mother has four children, two of which are eighteen years old or older and two of which are minors. Her youngest daughter, K.R., was born in July 2010.[2] Mother was involved with the Department of Child Services ("DCS") with her older children when they were younger, and she was involved with DCS when K.R. was born because she admitted to using marijuana and prescription pills while she was pregnant. However, the reasons for, and extent of, DCS's involvement in each of these prior cases is unclear based on the record.

On June 18, 2013, when K.R. was three years old, law enforcement officers found her unattended and strapped into a seat in Mother's van. The temperature outside was eighty degrees, the windows of the van were closed, and Mother had left K.R. in the van by herself for thirty to thirty-five minutes. As a result, the officer arrested Mother and placed K.R. into a relative's care. Thereafter, the State charged Mother with Class D felony neglect of a dependent. She bonded out of jail but, as a condition of her bond, was required to report for day reporting through community corrections.

After K.R.'s removal, the investigating case manager for DCS spoke with Mother, and she admitted to using K2 spice, an illegal drug, around the same time that K.R. had been removed. However, she claimed that she did not need substance abuse treatment because she could quit whenever she wanted.

---

[2] Only K.R. is the subject of this appeal.

Nevertheless, on June 25, 2013, DCS filed a petition alleging that K.R. was a child in need of services ("CHINS").[3]

[4] Subsequently, DCS began providing Mother with reunification services. It assigned Kevin Bezy ("FCM Bezy") as Mother's family case manager in June of 2013. At the time, Mother did not have stable housing or employment, so FCM Bezy had trouble keeping in contact with her because she did not give him a valid address or phone number. Mother stayed with her brother for a while, and FCM Bezy went to that address at least a couple of times trying to reach her, but he never found anyone home. He left a note for Mother on her brother's door each time, but she never responded. As a result, FCM Bezy's contact with Mother was "sporadic." (Tr. 80). It later became clear that Mother's brother was involved in criminal activity in his house because, in October of 2013 or 2014, police officers "raided" the house and found methamphetamine.[4] (Tr. 28).

[5] In the meantime, Alyson Grider ("Grider"), a visit supervisor with Family Solutions, was assigned to conduct supervised visitation for Mother and K.R. Based on FCM Bezy's input and Mother's agreement, Grider established that

---

[3] For different reasons that are not specified in the record, Mother's other minor child was also the subject of CHINS proceedings during this time period. At the time of the termination hearing, her other minor child was due for a dispositional hearing.

[4] It is not clear whether this occurred in October 2013 or 2014. DCS states in its brief that it occurred in 2013, which was when Mother was living with her brother. However, at the termination hearing, DCS asked Mother: "In fact, you'd stated . . . in October 2014 . . . the police raided that home, correct?" and Mother replied, "Yes." (Tr. 28).

Mother would visit K.R. twice a week for three hours each visit. However, over the next few months, Mother's participation in visitation was irregular. Her inconsistency resulted, in part, from her continued criminal activity. Mother was non-compliant with her day reporting requirement, and the court issued multiple warrants for her arrest over the next few months. In addition, on August 13, 2013, Mother was charged with Class D felony theft as a result of stealing her grandmother's tool box and checks.[5] Due to these circumstances, Mother was in jail from July 13 to August 12, 2013 and from October 28 to October 30, 2013. After both of these periods in jail, she was released with the requirement that she continue day reporting. However, she was not compliant with this requirement, and on December 7, 2013, she was arrested and held without bail. She remained incarcerated through the remainder of the CHINS and termination proceedings.

[6] On November 20, 2013, prior to Mother's last incarceration, the trial court held a fact-finding hearing on DCS's petition alleging that K.R. was a CHINS. It determined that K.R. was a CHINS and held a dispositional hearing on January 30, 2014. Subsequently, it entered a dispositional order requiring Mother to participate in services "to the extent possible" considering her incarceration. The services it ordered included: (1) a mental health evaluation;

---

[5] It is not clear from the record which of these actions was the factual basis for the charge, and Mother later testified at the termination hearing that she could not remember.

(2) contact with the child; (3) parenting classes; and (4) drug treatment. (DCS's Ex. 1 at 6).

[7] On February 12, 2014, Mother pled guilty to her neglect of a dependent and theft charges. The trial court sentenced her to two years (2) executed on the neglect of a dependent conviction and three (3) years, with 728 days suspended, on the theft conviction. It further ordered Mother to serve the sentences consecutively.

[8] While incarcerated, Mother completed a parenting class, a three-day program called The First 180 days, which addressed re-entry into society; the Standardized Pre-Released Orientation Program, a program felony offenders are required to take that is designed to prevent recidivism; and a faith-based seminar presented by Gone Fishing and Clearwater Ministries. Mother also started a literacy program and a program called Triple R, which was "something like a mother's class[.]" (Tr. 9). However, she had disciplinary problems in the Triple R program. One report noted that she was:

> begging other program participants for food, manipulating staff to make phone calls, gossiping and spreading rumors amongst other negative behaviors and when told not to do these things would still do them. She would sign out of programming to go to her caseworker's office when she had not been called for and it was not [the caseworker's] open door time.

[9] (App. 199). As a result, the coordinators of Triple R told Mother that if she had any more disciplinary problems, she would be terminated from the program.

Thereafter, she was caught cheating in her literacy class and was, therefore, terminated from both the literacy and Triple R programs.

[10] In addition to Mother's misconduct in the Triple R program, she also received several institutional reprimands. In 2014, she was written up once for refusing to obey an order and twice for tobacco possession, which was not permitted. In 2015, she was written up twice for refusing an assignment and once for "[i]nadequate [w]ork/[s]tudy performance." (App. 199). The write-ups for refusing an assignment occurred because she had been assigned to work in the Madison State Hospital kitchen but was terminated because she frequently was sick or asked to be returned to the prison. She received the write-up for inadequate work/study performance because she was fired from her job. However, Mother did work on a road crew for six or seven months.

[11] Other than the above programs that Mother completed while incarcerated, she did not complete any services except for visitation. Initially, both DCS and the Court Appointed Special Advocate ("CASA") were opposed to K.R. visiting mother in prison. Mother petitioned the court for visitation, however, and in September 2014, the court ordered K.R. to be brought to the prison for visitation. They visited three or four times in total during the seven months Mother was incarcerated.

[12] On June 19, 2014, the trial court held a hearing and changed K.R.'s permanency plan from reunification to adoption. Thereafter, on August 13,

2014, DCS filed a petition to terminate Mother's parental rights. The trial court held a termination hearing on April 7, 2015, when K.R. was four years old.

[13] On the morning of the hearing, Mother moved for a continuance. She stated that she was due to be released from prison in twenty-three days and requested that the court allow her two months after her release to prove that she was willing and able to parent K.R. before it conducted a termination hearing. DCS objected to Mother's motion and argued that the delay would harm K.R. because she had already been removed from Mother's care for over twenty-two months. DCS also noted that Mother's request for an extra two months could result in an even more significant delay due to CASA's limited availability over the summer. Further, DCS noted that K.R. needed permanency and that her foster placement was willing to adopt her. After hearing the parties' arguments, the trial court denied Mother's motion for a continuance and proceeded with the hearing.

[14] During the hearing, Mother admitted that she had declined to take advantage of services that DCS had provided for her. DCS asked her why she had declined to utilize the services of a home-based case manager who had been referred to help her look for a job, and Mother replied that she believed she was "capable of trying to find stuff on [her] own." (Tr. 30). She also acknowledged that she had failed to participate in any of the other services DCS had provided in the five months before her incarceration because she had been "getting in and out of trouble." (Tr. 72). She claimed that she had focused her attention on

visitation during that time, but she acknowledged that her visitation attendance had nevertheless been inconsistent.

[15] As for her participation in services after her incarceration, Mother testified that she could not remember which services the trial court had ordered her to complete. When asked, she acknowledged that she had not received drug treatment, a mental health evaluation, or any individual counseling. She also admitted that she had not asked her family case manager or public defender how she could complete the mental health evaluation requirement, but she refused to acknowledge that she needed counseling.

[16] With regard to her criminal activity, Mother stated she had stolen from her grandmother because she had been trying to get money for bills while she was staying in her brother's trailer, and she "[did not] see how that [was] a crime." (Tr. 37). She also said that she had "continued to use illegal drugs [during her pregnancy with K.R.] knowing that [they were] illegal and that [K.R.] could potentially be removed from [her] care." (Tr. 27).

[17] Next, FCM Bezy testified and stated that Mother had not requested any services or visitation. He also testified that she had not been confused about which services the court had ordered her to complete. He had talked to Mother at one point during her incarceration about her lack of participation, and she had given several reasons for her non-compliance. The reasons varied in nature from "she knew she had an arrest warrant out so she didn't want to be picked up at a visit, to . . . just not being able to get a ride [to having] other errands to

run at that time." (Tr. 83). FCM Bezy testified that Mother's home-based case manager could have helped Mother with transportation for services, but Mother had never asked for any help. He also testified that Mother had failed to attend any of DCS's child and family team meetings, which he described as meetings where the service providers for Mother had "talk[ed] about the case progress" and "develop[ed] a plan" to meet the family's goals. (Tr. 84). He said that he had given Mother the dates and times for these meetings, which had been about once a month, and that she had never told him why she had not attended them.

[18] FCM Bezy also discussed Mother's parenting skills. He testified that he had observed one of her visits with K.R. and thought that the visit had gone well. Mother had been affectionate with K.R., and he had not observed any behavior that concerned him. However, he mentioned that at one point Mother had told him that she did not understand why DCS had been required to remove K.R. He found it "a concern" that she still had not understood why K.R. had been removed. (Tr. 87).

[19] Mother's home-based case manager, Samantha Harrell ("Harrell"), also testified at the hearing concerning Mother's completion of services. She said that she had received a referral from DCS on October 2, 2013, to provide weekly home-base management services for Mother, beginning in October 2013. She had attempted to contact Mother multiple times, though, and had experienced trouble reaching her. She had left messages, but the only time she had heard from Mother in October had been on one occasion when Mother had called to ask for a ride to the store. Harrell had encouraged Mother to set up a

time to meet with her at her office, but Mother had not done so. Mother had also failed to attend any appointments for home-based case management in November and December. Harrell testified that Mother had called once in November to say that she was in Greene County and did not have access to a phone. Then, Mother had called a second time to see if Harrell could contact her probation officer to help her get off of probation. Harrell had encouraged Mother to contact a DCS worker and then had not heard from her until she had found out in December that Mother had been arrested and was in jail again. Harrell testified that she had never had a chance to meet with Mother to set goals and determine how Mother wanted to proceed. She also explained that providing transportation to run errands, as Mother had requested, was not a normal function of home-based case management.

[20] Mother's two visitation supervisors, Grider and Nicholas Bartalone ("Bartalone"), testified regarding Mother's parenting during visits with K.R. Grider, who supervised Mother's visits from June to September 2013, noted that Mother could have had eight visits per month during this time if she had scheduled every visit she had been allowed to schedule. However, Mother had scheduled only eleven total visits and had attended only five out of those eleven visits. Grider said that Mother had cancelled one of these visits because she had been worried that her family would report the visit to the police and she would be arrested because of her outstanding arrest warrant. Grider further noted that she had provided Mother with transportation to some of the visits and that, on the way to an August visit, Mother had been "paranoid" about her

arrest warrant and was "always looking for cops." (Tr. 127). She said that Mother had also refused to provide Grider with her address due to her concerns about the warrant.

[21] As for the visits that Mother had attended, Grider said that Mother had failed to provide necessary supplies for K.R. The guidelines for visitation, which Mother had signed, had stated that parents were required to bring supplies for their children during visits. Grider said that, eventually, K.R.'s foster placement had provided K.R.'s necessary supplies, even though doing so had violated the visitation guidelines. Grider also said that she had needed to redirect Mother from discussing subjects pertinent to her case in front of K.R. However, Grider testified that Mother's interactions with K.R. had been "positive" and that she had not had any safety concerns. (Tr. 37). K.R. had always been happy to see Mother.

[22] Bartalone took over as Mother's visitation supervisor in September 2013. He testified that he had consulted with Mother about the visitation schedule, and Mother had not objected to continuing the visit schedule of two three-hour visits per week. Between September and December 2013, Mother had attended six out of the twenty visits that were scheduled. She had never requested to make up missed visits, and she had never contacted Bartalone to request a different day or time for scheduled visitation. Mother also had not attended any visits in November. However, like Grider, he had not had any concerns with Mother's parenting during the visits that she had attended.

[23] Mindy Wright ("FCM Wright"), who became Mother's family case manager in January of 2015, testified at the hearing that DCS had made all of the services in the trial court's dispositional order available to Mother. They had referred her for supervised visitation, a mental health evaluation, a drug and alcohol assessment, and home-based case management with a parenting evaluation. She testified that DCS had not provided services to Mother in prison because it did not contract with any service providers who would provide services in prison. However, she stated that Mother had never contacted her about completing services or about the service options that would be available to her after her release from prison.

[24] Finally, the CASA volunteer appointed to represent K.R., Vicki Mellady ("Mellady"), testified that she believed it was in K.R.'s best interests for Mother's parental rights to be terminated. She thought that K.R. had not exhibited any signs of having a closer relationship with Mother than any of the other people in her life. In addition, Mellady said that she believed that the conditions that had led to K.R.'s removal had not been resolved because "[K.R.] was not the person that mom always thought about. . . . [M]om always put herself first." (Tr. 207).

[25] After the hearing, on July 1, 2015, the trial court entered its order terminating Mother's parental rights. Mother now appeals.

# Decision

Mother raises two issues on appeal: (1) whether the trial court abused its discretion when it denied her motion to continue the termination hearing to allow her more time to complete services; and (2) whether the trial court erred in terminating her parental rights based on its conclusion that the conditions that had led to K.R.'s removal from the home and continued placement outside of the home would not be remedied. We will address each of these arguments in turn.

## 1. Motion to Continue

First, Mother argues that the trial court abused its discretion when it denied her pre-hearing motion to continue the termination hearing. She argues that she was due to be released from prison within twenty-three days and that a continuance would have allowed her to demonstrate her interest in and ability to parent K.R. outside of prison, since prison had impeded her completion of services. She also argues that DCS did not have an urgent need to terminate her parental rights because K.R. was already living in her pre-adoptive home.

The decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court, and we will reverse the trial court only for an abuse of discretion. *Rowlett v. Vanderburgh Cnty. Office of Family and Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied.* We may find an abuse of discretion in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion. *Id.* However, we will not find

an abuse of discretion when the moving party has not demonstrated that he or she was prejudiced by the denial. *Id.*

[29] In support of her arguments, Mother cites to *Rowlett* where we reversed the trial court's denial of a motion to continue a termination hearing. Like Mother, the father in that case was incarcerated and was due to be released shortly after his scheduled termination hearing—within six weeks. *Id*. He requested the continuance because he wanted an opportunity to become established in the community and to participate in services directed at reunifying him with his children. *Id.* We reversed the trial court's denial of this motion on the basis that he had not had an opportunity to demonstrate his fitness as a parent due to his incarceration. *Id.* He had been arrested two months after his children had been removed from his care. *Id.* at 618. In addition, we noted that the prejudice to the father—that his parental rights were terminated—was "particularly harsh" because he had participated in numerous services and programs offered by the jail while he had been incarcerated. *Id.* at 619. We also noted that a continuation of the termination hearing would not have had much impact on the children because they were already living with their potential adoptive placement. *Id.*

[30] While there are some similarities between *Rowlett* and the instant case, we do not find it entirely on point. Unlike in *Rowlett*, Mother had six months prior to her incarceration to engage in services and demonstrate her fitness as a parent. Also unlike the father in *Rowlett*, Mother did not engage in numerous services and programs while she was in prison. She completed only one course

addressing the services the trial court had ordered—her parenting class—and she was terminated from multiple other programs.

[31] Instead, we conclude that Mother failed to demonstrate that there was good cause to continue her termination hearing. A trial court determines whether a party has presented good cause for a continuance based on "the circumstances present" in the case, "particularly in the reasons presented to the trial judge at the time the request was denied." *F.M. v. N.B.*, 979 N.E.2d 1036, 1040 (Ind. Ct. App. 2012) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964), *reh'g denied*). Here, Mother did not demonstrate that allowing her more time to complete services was a justifiable reason for delaying the hearing. She had already had the opportunity to participate in services during the six months prior to her incarceration, and she had failed to do so. Additionally, she had failed to complete programs she had been offered while incarcerated. Further, Mother's termination hearing had already been delayed, and had the potential to be delayed even further than intended, if the trial court had granted her motion. Specifically, on the date of the termination hearing, several months had already passed since DCS had filed its petition to terminate Mother's parental rights, and the trial court had already granted Mother three continuances. Also, in addition to the twenty-three days remaining of Mother's incarceration, she requested two months to complete services, and DCS testified that the delay could be exacerbated even further due to CASA's limited availability during the summer. In light of these factors, we conclude that Mother did not present

good cause to continue the termination hearing, and, therefore, the trial court did not abuse its discretion in denying her motion.

## 2. Termination

[32] Next, Mother argues that the trial court erred in terminating her parental rights. Specifically, she argues that DCS did not present clear and convincing evidence that the reasons that led to K.R.'s removal and continued placement outside of her care would not be remedied.[6]

[33] To terminate a parent-child relationship, a petition must allege that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

IND. CODE § 31-35-2-4(b)(2). The State must prove these allegations by clear and convincing evidence. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014),

---

[6] Mother also seems to challenge the trial court's conclusion that termination of her parental rights was in K.R.'s best interests. However, she does not provide any argument in support of that claim, and, accordingly, we conclude that she has waived it. *See Matter of A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997) (stating that an appellant's failure to provide us with cogent argument and authority to support a claim waives that argument on appeal).

*trans. denied.* If the court finds that the allegations in the petition are true, the court must terminate the parent-child relationship. I.C. § 31-35-2-8.

[34] When reviewing findings of fact and conclusions thereon in a case involving a termination of parental rights, we apply a two-tiered standard of review. *In re M.W.*, 943 N.E.2d 848, 853 (Ind. Ct. App. 2011), *trans. denied*. First, we determine whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A trial court's judgment is clearly erroneous if the findings do not support its conclusions or the conclusions do not support the judgment. *Id.* Further, we will "consider only the evidence and reasonable inferences therefrom that support the [court's] judgment" terminating parental rights. *Id*. We will not "reweigh the evidence or reassess the credibility of the witnesses." *Id*.

[35] When determining whether the conditions that resulted in a child's removal from a parent's care will not be remedied, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *Z.C.*, 13 N.E.3d at 469. The court must evaluate a parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* In making this determination, the court balances any parental improvements against parental habitual patterns of conduct. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring

trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* Further, DCS is not required to rule out all possibilities of change; rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[36] In the past, we have found that trial courts have properly considered a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment when determining whether a parent's conditions will be remedied. *In re Z.C.*, 13 N.E.3d at 469. A trial court may also consider the services offered to the parent by DCS and the parent's response to those services. *Id.* The court does not need to wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating a parent-child relationship. *Id.*

[37] Here, Mother argues that in one of the trial court's conclusions, as well as six of the trial court's findings supporting that conclusion, it inappropriately shifted the burden of proof to her instead of DCS. The trial court's conclusion Mother challenges was that:

> Mother's testimony did not reflect a reasonable plan to provide for [K.R.] upon her release from prison and into the future. Her plan was to get financial assistance from her grandmother, with no collaborating [sic] evidence that the grandmother could provide the financial assistance for housing. Although Mother

was optimistic about applying for the state highway employment she did not articulate any specific steps to achieve that goal.

(App. 28).

[38] We disagree with Mother's argument that the trial court inappropriately shifted the burden to Mother, but we need not address whether the conclusion was erroneous on that ground, because we have held that "even an erroneous finding is not fatal to a trial court's judgment if the remaining valid findings and conclusions support the judgment, rendering the erroneous finding superfluous and harmless as a matter of law." *Curley v. Lake Cnty. Bd. of Elections and Registration*, 896 N.E.2d 24, 32 (Ind. Ct. App. 2008) (quoting *M.K. Plastics Corp. v. Rossi*, 838 N.E.2d 1068, 1074 (Ind. Ct. App. 2005)), *trans. denied.* Here, several of the trial court's remaining, uncontested conclusions independently support its judgment that the conditions that led to K.R.'s removal and continued placement outside of Mother's care would not be remedied.

[39] K.R. was removed from Mother's care and adjudicated a CHINS because of Mother's: (1) neglect in leaving K.R. unattended in a van on a hot day; (2) use of illegal drugs; and (3) lack of participation in services. In its order terminating Mother's parental rights, the trial court listed the following conclusions in support of its determination that the circumstances that led to K.R.'s removal and continued placement outside of Mother's care would not be remedied:

> 56. Mother has not resolved the reason for [K.R.'s] removal from her care. [K.R.] was removed because Mother left her unattended and strapped in her car seat in a locked and hot van

when she was three years old and Mother left the home. [K.R.'s] very life was endangered. Although Mother begrudgingly admitted at the parental rights hearing that she should have checked to be sure that [K.R.] was removed from the van, Mother did not check and she expressed no plan to check on [K.R.] before she left the home. The court concludes that Mother does not sincerely take responsibility for the initial neglect and endangerment of [K.R.], and Mother continues to blame others. Mother's statements do not reflect a true understanding of [K.R.'s] need for supervision and the risk of extreme harm due to her neglect of the most basic caregiving— supervision.

57. Mother's initial neglect and Mother's sporadic visitation with [K.R.] show an inability to prioritize the child's needs over her own. Mother's commitment of additional criminal activity after [K.R.'s] removal and non-compliance with criminal court appearance orders, show a basic disrespect of the property of others, laws, and the legal process. Mother's refusal to utilize drug treatment, counseling and case management services, and Mother's testimony that this court interprets as her denial that she needs those services, reflect a lack of insight that her use of drugs, criminal lifestyle, lack of sound judgment in parenting supervision, and lack of stable housing and employment negatively impact her ability to provide [safety] for [K.R.].

58. Without counseling it is unlikely that Mother can appreciate the needs of [K.R.] and prioritize those needs over her own. Mother does not express a sincere understanding of this. The court does not find any reasonable likelihood that Mother will pursue counseling.

59. Of great concern is Mother's total lack of respect or willingness to cooperate to any reasonable degree with service providers and case managers so that she could appreciate the risk she caused to [K.R.] by her initial act of neglect, and Mother's

ongoing inability to get employment or stable housing, her refusal to utilize case management services to assist, and her refusal to maintain regular contact with [K.R.] before she went to prison.

60. Mother could not recall at the Parental Rights Hearing what services were ordered for her. Case Manager Kevin Bezy was concerned that Mother did not understand that she had a sincere parenting problem that had to be addressed. Case Manager Mindy Wright listed Mother's barrier to reunification as her unwillingness to utilize treatment services. Mother did not articulate in her testimony any services that she thought she needed, although she clearly stated her willingness to cooperate with DCS and to follow conditions of probation when she is released from prison. Without an understanding of how she places her child at risk, Mother is not likely to undertake the services necessary to help her provide safe parenting, stable housing and income, and exercise sound parent judgment.

61. Mother had an opportunity from [K.R.'s] removal in June 2013 until her incarceration in the Monroe County Jail in December 2013 to utilize extensive services and opportunities to demonstrate a commitment to her child through visitation. The service providers tried to track her down and offered extensive services [at] no cost to Mother for drug treatment, counseling, and case management to obtain housing and employment. Mother completely rejected the services and still does not make a sincere statement that she needs services. Mother's incarceration in the Monroe County Jail in December 2013 was of her own cause. Her ongoing criminal behavior and violations of warrants and other orders of the criminal court resulted in her incarceration until sentencing to prison. She voluntarily sacrificed her opportunity to use rehabilitation services.

62. Mother also had opportunities for rehabilitation in prison from April 2014 to her discharge in April 2015. She had a

significant opportunity in prison to learn and demonstrate character traits and behaviors indicative of an ability to provide a safe and stable lifestyle for [K.R.]. Madison offered Mother the Triple R program to address criminal behavior and thinking through education, life skills and community services, Responsible Mother Program, Work Opportunities, access to special programming like Gone Fishing, and standard re-entry and exit programming for all inmates. The quality of Mother's participation in these programs, her daily conduct in the prison system, and her work assignments could have demonstrated a capacity for rehabilitation and a likelihood that the reasons for removal of [K.R.] could be remedied.

63. Mother is applauded for her participation in the Responsible Mother Program and some other good programming and positive road crew experiences. However[,] in the overall picture, the court does not find that Mother demonstrated a willingness or ability to make changes essential to safe parenting in her particular case despite [being] given the opportunity to do so at Madison. Mother was removed from the literacy program for cheating and from the Triple R program, Mother was canceled from some work assignments for refusing to appear for work, [and] Mother committed institutional behavior violations through March 2015. The Offender Reviewed form signed by case manager Kuppler and Mother in April 2015 shows "none" for affirmative indicators. Mother's negative behaviors with staff and inmates stated in the Offender Reviewed form for her release from prison does not reflect an attitude of responsibility and accountability that would be significant to maintaining employment, healthy adult and parent-child relationships, respect for rules reflecting a choice to avoid future criminal behavior, and the ability to place the needs of [K.R.] first.

64. Although Mother may not have been offered counseling in the prison, she testified that she did not need counseling. Therefore[,] even if provided counseling, it was not likely to be

successful. Mother did not testify whether drug treatment was available in the prison, but her testimony did not reflect that she thought she needed treatment for her long history of marijuana use.

*    *    *

66. The court concludes by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in [K.R.'s] removal from Mother, and ongoing placement outside of Mother's care, will not be remedied.

67. Although Mother most likely will have been released from prison by the time this opinion is issued, based upon the evidence above of her non-compliance with services and lack of recognition of her parenting problems, her release from prison is insufficient to create a reasonable likelihood that Mother will resolve the reasons for [K.R.'s] removal from her care.

(App. 25-28).

[40] In these conclusions, the trial court listed several grounds for its judgment, including Mother's: (1) refusal to take responsibility for endangering K.R. by leaving her unattended in a hot van; (2) lack of understanding that she needed to supervise K.R.; (3) poor visitation record; (4) lack of respect for the law, as demonstrated by her criminal activities during the CHINS proceedings; (5) refusal to utilize services or recognize that she needed those services; (6) poor performance in multiple programs and opportunities that she was offered while incarcerated; (7) misconduct in prison; and (8) poor attitude. The conclusion that Mother challenges—that she did not have a reasonable plan for K.R. for

her release from prison—was just one minor conclusion out of many that the trial court listed. Further, it is clear that Mother's lack of participation in services, as well as her refusal to acknowledge that she needed services, were the primary reasons that the trial court determined that she would not remedy the conditions that led to K.R.'s removal, as the trial court discussed those two factors repeatedly. In light of this overwhelming support for the trial court's judgment, we conclude that, even if the conclusion Mother challenges was erroneous, the trial court's judgment was not.[7]

Affirmed.

Baker, J., and Bradford, J., concur.

---

[7] The rest of Mother's arguments amount to a request that we reweigh the evidence before the trial court, which we will not do. *See In re M.W.*, 943 N.E.2d at 853.